| | |
|---|---|
| 1 | CONSTANCE J. YU (State Bar No. 182704)<br>E-Mail:     *cyu@sideman.com* |
| 2 | ELLEN P. LIU (State Bar No. 280459)<br>E-Mail:     *eliu@sideman.com* |
| 3 | SIDEMAN & BANCROFT LLP<br>One Embarcadero Center, Eighth Floor |
| 4 | San Francisco, California 94111-3629<br>Telephone:    (415) 392-1960 |
| 5 | Facsimile:     (415) 392-0827 |
| 6 | ROBERT R. CROSS (State Bar No. 56814)<br>E-Mail:     *rcross@fablaw.com* |
| 7 | FITZGERALD ABBOTT & BEARDSLEY LLP<br>1221 Broadway, 21st Floor |
| 8 | Oakland, CA 94612<br>Telephone:  (510) 451-3300 |
| 9 | Facsimile:   (510) 451-1527 |
| 10 | Attorneys for Plaintiff<br>IGUAÇU, INC. |

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| IGUAÇU, INC., | Case No. C 09-0380 RS (NMC) |
|---|---|
| Plaintiff, | **PLAINTIFF IGUAÇU, INC.'S OPPOSITION TO DEFENDANT ANTONIO CABRERA MANO FILHO'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
| v. | |
| ANTONIO CABRERA MANO FILHO, | |
| Defendant. | Date:     December 20, 2012<br>Time:    1:30 p.m.<br>Dept.:   Courtroom 3, 17th Floor<br>Judge:  Honorable Richard Seeborg |

Case No.:  C 09-0380 RS (NMC)
IGUAÇU'S OPPOSITION TO CABRERA'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................................ 1

II.   RESPONSE TO CABRERA'S "UNDISPUTED MATERIAL FACTS" ............................ 2

      A.   The "Securities" Issue .............................................................................................. 2

      B.   The Testimony Regarding – and the Documentary Evidence Underlying –
           Summary #2 of Iguaçu's Expert Witness Report ..................................................... 4

III.  LEGAL STANDARD .......................................................................................................... 6

IV.   THE QUOTAS PURCHASED BY ADM WERE NOT SECURITIES .............................. 7

V.    EQUITABLE DEFENSES PRECLUDE SUMMARY JUDGMENT .................................. 9

VI.   DAMAGES ......................................................................................................................... 10

      A.   Cabrera's Attempt to Avoid Paying Commissions on $469 Million Brazilian
           Reais of Commissionable Events is Untenable as a Matter of Law ....................... 10

VII.  CONCLUSION ................................................................................................................... 12

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3629

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Acree v. General Motors Acceptance Corp.*,
   92 Cal. App. 4th 385 (2001) .................................................................................................. 11

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................................ 6

*Calderone v. United States*,
   799 F.2d 254 (6th Cir. 1986) ................................................................................................... 7

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................................. 6, 7

*Danner v. Himmelfarb*,
   858 F.2d 515 (9th Cir. 1988) ................................................................................................... 7

*Keith v. Black Diamond Advisors, Inc.*,
   48 F. Supp. 2d 326 (S.D.N.Y, 1999) ....................................................................................... 8

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) ................................................................................................. 11

*Ray Communications, Inc. v. Clear Channel Communications, Inc.*,
   673 F.3d 294 (4th Cir. 2012) ................................................................................................... 7

*Royal Air Properties, Inc. v. Smith*,
   312 F.2d 210 (9th Cir. 1962) ................................................................................................... 9

*S.E.C. v. M&A West, Inc.*,
   538 F.3d 1043 (9th Cir. 2008) ................................................................................................. 9

*Shakur v. Schriro*,
   514 F.3d 878 (9th Cir. 2008) ................................................................................................... 7

*Slevin v. Pedersen Associates, Inc.*,
   540 F. Supp. 437 (S.D.N.Y. 1982) .......................................................................................... 8

*Stilwell v. Smith & Nephew, Inc.*,
   482 F.3d 1187 (9th Cir. 2007) ............................................................................................... 12

*U.S. v. Union Pacific R. Co.*,
   565 F.Supp.2d 1136 (E.D. Cal. 2008) ................................................................................... 12

*Weinberg v. Whatcom County*,
   241 F.3d 746 (9th Cir. 2001) ................................................................................................. 10

**STATUTES**

Cal. Corp. Code § 25019 ............................................................................................................. 8

**OTHER AUTHORITIES**

CACI Jury Instruction 350 ........................................................................................................ 11

Federal Rule of Civil Procedure 56 ........................................................................................... 12

Federal Rule of Evidence 702 ................................................................................................... 12

## I.  INTRODUCTION

Cabrera's motion for summary judgment ("Cabrera Mot.") does its best to obfuscate the dispositive issue: did Archer Daniels Midland (ADM) purchase passive interests from Cabrera that would constitute "securities," or did it purchase joint venture interests giving it rights analogous to a general partner?  Cabrera does not and cannot dispute that ADM intended to purchase and did purchase joint venture interests, and thereafter actively participated in management of the ventures.  It is therefore entirely irrelevant whether Iguaçu was a registered securities broker or acted only in the capacity of a "finder," whether the transactions had direct or only incidental connections with California or Illinois, whether the Cabrera family had previously structured the entities as stock companies, LLCs, or Cayman Island trusts, whether the interests in the entities had been owned exclusively by Cabrera personally or divided among two, three or even dozens of members of the family, or whether all Cabrera family members were active in management or some were entirely passive investors.

Iguaçu therefore will ignore (without conceding) Cabrera's arguments that Iguaçu is not a "finder" under state and federal law (Cabrera Mot., at 5-18); and that Iguaçu "brokered" the sale of Cabrera's interests in the United States and California (*id*., at 23), and will address only the dispositive issue of whether the interests purchased by ADM constitute "securities" under state or federal law.  (*Id.*, at 19-23.)  Since the undisputed facts demonstrate that the interests purchased by ADM did not constitute securities, Cabrera's defense fails.[1]  Alternatively, even assuming for the sake of argument that Iguaçu "brokered" the purchase or sale of "securities," the motion cannot be

---

[1]  Recognizing that ADM unquestionably intended to purchase and did purchase interests in LLCs, and not stock in corporations (or their Brazilian counterparts), Cabrera now argues in the alternative that Iguaçu at least "attempted" to induce ADM to purchase "securities" from Cabrera. (Cabrera Mot., at 22-23.)  The belated fallback position fails.  Cabrera provides no evidence that Iguaçu knew the existing structure of the Cabrera entities, much less that it advertised, marketed or attempted to induce ADM to purchase "stock" or other form of "security" from Cabrera.  Indeed, the Motion cites deposition testimony of Iguaçu's CEO, Shobha Seturam, that while Iguaçu understood any future transaction *could* involve securities, she did not discuss the possible structure with potential investors (such as ADM) because "there's no way" of predicting the structure that investors would choose.  (*Id.,* at 5:4-8, citing Seturam Depo, at 76:9-22.)

granted based on estoppel, unjust enrichment or unclean hands.

Finally, Cabrera's attempted motion for partial summary judgment as to certain categories of damages must be denied because he has not provided any evidence to disprove causation of such damages, has mischaracterized the testimony of Iguaçu's damages expert, and has ignored other documentary evidence that would support a finding in Iguaçu's favor irrespective of its expert's conclusions.

## II.  RESPONSE TO CABRERA'S "UNDISPUTED MATERIAL FACTS"

### A.  The "Securities" Issue

Iguaçu has already articulated its position on the background of the proceedings and undisputed facts material to the issue of whether the interests purchased by ADM constituted "securities" under state or federal law, and will only briefly summarize that presentation here. (*See* Memorandum in Support of Motion of Plaintiff Iguaçu for Partial Summary Judgment ("Iguaçu MSJ Memo.") (Dkt. #231.)

ADM acquired 49% of the membership interests ("quotas") in "CCEAA/Limeira" and 80% of the quotas in "Jatai", as well as three newly-formed LLCs.[2]  (*Id.*, at 4-5.)

After careful consideration of the character of the transaction, this Court agreed with Judge Chen's conclusion in September 2010 that Iguaçu had not met its burden of demonstrating that the interests purchased by ADM were not "securities," since Iguaçu lacked evidence that Cabrera actually participated in the management and control of the entities, rather than being a passive investor.  (Report and Recommendation 6-7, Dkt. # 91 (Exhibit A to Iguaçu MSJ Memo.); Order Adopting Report, Dkt. # 101)  Judge Chen noted that under an "economic realities" analysis, a good argument could be made that the Court should look to the intended ultimate outcome of the transaction rather than the status of the interest sold at the moment of transfer, and in its subsequent Order denying Iguaçu's motion for reconsideration, this Court again identified the

---

[2] Bela Vista Bio Etanol Participações ("Bela Vista"), Ceres Holding Participações Ltda. ("Ceres"), and Bacuri Agrícola Ltda. ("Bacuri").  Further details of the joint venture ownership structure are discussed below.

critical question as being whether ADM "obtained an interest that should be characterized as active rather than passive." (Order Denying Mot. for Recons., at 3:15-19, Dkt. # 177) (Exhibit B to Iguaçu MSJ Memo.) Since the securities laws were primarily enacted to protect investors, "a good argument can be made that the crucial issue is whether the buyer obtained an essentially passive interest, regardless of what the seller's status may have been prior to the transaction." (*Id*., at 3:1-3.)

Iguaçu has now done what Judge Chen and this Court made clear that it needed to do: provide evidence to demonstrate that ADM was not a "passive investor" but had the right to exercise – and did exercise – substantial management and control of the joint venture entities. Since Cabrera has no way to challenge that showing, his motion carefully ignores the issue and attempts to turn the "economic realities" test on its head by focusing not on what ADM purchased, but on what the Cabrera family did with their interests in the entities in order to put them in a form that ADM would be willing to purchase. Cabrera cites no persuasive authority for his interpretation, which makes absolutely no sense in light of the purpose of the securities laws, which were intended to protect investors (here ADM) from harm at the hands of sellers (here, Cabrera) who control how the investors' money is used or misused. (Cabrera Mot., at 10-12.)

Needless to say, Cabrera cites no case – and we are not aware of any – that holds or even suggests that a sophisticated investor who purchases a 49% LLC interest (much less an 80% interest) and is actively involved in managing the LLC, should expect, need or be entitled to protection as a purchaser of "securities."

Cabrera makes no attempt in his motion to address, much less rebut, the testimony of Mr. Lastra, ADM's senior executive overseeing operations in Brazil during the ADM-Cabrera transactions, that ADM intended to enter into a joint venture with Cabrera and build ethanol plants, that ADM knew the industrial side of the sugar and ethanol business and wanted to enter into a partnership with Cabrera because of his knowledge of agriculture and farming, that the parties' letter of intent set forth terms for the joint development of current and future projects, and that ADM conducted a thorough investigation and analysis of the industrial and agricultural sides of the sugar and ethanol business. (Iguaçu MSJ Memo, at 3.)

The agreements establishing the joint venture make clear that ADM and Cabrera would have equal management rights and equal rights to appoint managers to operate the entities, and Mr. Lastra confirmed that ADM actively participated in the management of Limeira. (*Id.,* at 4.) Other Cabrera family members ceased to hold ownership interests in the LLCs once their quotas were included in the transfers to ADM. (*Id.,* at 5.)

### B. The Testimony Regarding – and the Documentary Evidence Underlying – Summary #2 of Iguaçu's Expert Witness Report

Iguaçu seeks commissions based on the elements of ADM investments or other financial benefits conferred on Cabrera or the ADM-Cabrera joint ventures. Given that the best sources of that information reside with ADM and Cabrera, Iguaçu served written discovery requests on Cabrera for financial records relating to the transactions. (*See* accompanying Declaration of Constance J. Yu in Opposition to Defendant's Motion for Summary Judgment, Etc. ("Yu Decl."), at ¶¶ 2, 3).)

The parties had significant discovery disputes relating to discovery over Iguaçu's damage claims. (*See*, *e.g*., Dkt. Nos. 216, 221, 223, 224, and 226; Yu Decl., at ¶¶ 4-6.) On September 26, 2012, the parties appeared for a discovery hearing before Magistrate Judge Nathanael Cousins, which among other things, resulted in an order requiring Cabrera to produce additional documents by October 5, 2012. (*See* Order dated September 28, 2012, Dkt. # 227, at 4.)

On Friday, October 5, 2012, Cabrera's counsel hand-delivered eight disks containing electronic copies of over 33,000 pages of documents in a form that was difficult to search electronically. (Yu Decl., at ¶¶ 7-9.) To put this belated production in perspective, Cabrera had previously produced only 1,328 pages of documents prior to the October 1, 2012 discovery cut-off during the two-year period since his appearance in the action. (Yu Decl.*,* at ¶ 8.)

On October 10, 2012, Iguaçu served its supplemental disclosures based on the best information available to it at that time. Iguaçu's supplemental disclosures set forth its claimed damages, delineated by categories of investments or other consideration provided by ADM. (Yu Decl., at ¶ 10, Exh. B.) On October 12, 2012, Iguaçu produced Charles Sterck, CPA, for deposition as Iguaçu's designated "person most knowledgeable" on the issue of damages, pursuant

to Fed. R. Civ. Pro. (FRCP) 30(b)(6).[3]  During his deposition as Iguaçu's PMK, Mr. Sterck provided the basis for Iguaçu's damages as set forth in Iguaçu's supplemental initial disclosures. (Yu Decl., at ¶ 11.)

On October 15, 2012, Iguaçu produced its expert witness report on damages prepared by Mr. Sterck ("Sterck Report").[4]  The Sterck Report included three excel charts.  The first chart, "Summary #1 Definitive Findings," derives from evidence which Mr. Sterck considered to be virtually unassailable because it was based on Cabrera's sworn discovery responses and other authenticated financial information.[5]  The second chart, "Summary #2 Findings that Require Additional Information or Clarification," derives from information which, in Mr. Sterck's view, is "likely to fall within the definition of a commissionable transaction according to the '"Finder's Agreement"' but that additional corroboration or authentication would be helpful.[6]  The third chart integrates the summaries from charts #1 and #2.[7]

On October 25, 2012, Mr. Sterck provided deposition testimony as Iguaçu's expert witness.  In his Report and his deposition testimony, Mr. Sterck broke down the various elements of damages into two categories based on qualitative factors considered in his damages analysis.  In both his Report and in his testimony, he observed that some source documents were capable of various interpretations.  For example, some documents were written in Portuguese, and certain documents might be explained based on the differences between American and Brazilian accounting principles.

---

[3] Iguacu advised Cabrera that it intended to present its damages claims through its designated expert witness.  (*See* Dkt. # 224, at 8-9.)

[4] Mr. Sterck's initial report was superseded by a corrected report dated October 18, 2012.  See Charles Sterck Expert Witness Report ("Sterck Report") attached as Exhibit E to the previously-filed Declaration of Matthew Ball in support of Defendant Antonio Cabrera's Motion for Summary Judgment, Etc. (Dkt. # 235) at Dkt. # 235, Pages 59-74 of 126.

[5] Sterck Report, Dkt. # 235, Pages 64-66, and 70 [chart #1] of 126.

[6] Sterck Report, Dkt. # 235, Pages 67-69, and 71 [chart #2] of 126.

[7] Sterck Report, Dkt. # 235, Page 72 [chart #3] of 126.

As to Summary #2, Mr. Sterck testified:

> "I would not say that this is a closed issue.  The only reason that I don't have this -- that I have this on page -- on Summary No. 2 is that I believe more work needs to be done to it.  **And should there be additional evidence, documentation, testimony or anything that comes to the table to support it, it will -- it will change my opinion as it relates to the validity of that figure**."[8]

Mr. Sterck specifically indicated that additional source information might be found in the "31,000+ pages" of additional documents produced on October 5, 2012 by Cabrera's counsel, which he had not had an opportunity to review or distill.[9]  To date, Iguaçu has not received any additional documents from defense counsel notwithstanding the representation that a supplemental production was forthcoming.  (Yu Decl., at ¶¶ 7, 15.)

## III.  LEGAL STANDARD

In order to prevail on his motion, Cabrera bears the initial burden of establishing that no issue of material fact exists and that he is entitled to judgment as a matter of law.  (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).)  Where, as here, Cabrera seeks summary judgment on his third affirmative defense (that the finder's agreement was illegal, unenforceable, void, and voidable because Iguaçu was not licensed to effect transactions in securities), he must conclusively establish all essential elements of that defense.[10]  (*See Celotex,* 477 U.S. at 331.)   Because Cabrera bears the burden of persuasion at trial on his affirmative defense (*see Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)), to prevail on summary judgment he must show that "the evidence is so powerful that no reasonable jury would be free to disbelieve it." (*Shakur v. Schriro*, 514 F.3d 878, 890 (9th

---

[8] *See* Charles Sterck Expert Witness Deposition ("Sterck Expert Depo.") attached as Exhibit F to the previously-filed Declaration of Matthew Ball in support of Defendant Antonio Cabrera's Motion for Summary Judgment, Etc. (Dkt. # 235) at Dkt. # 235, Page 83 of 126.

[9] Sterck Report, Dkt. # 235, Page 69 of 126.

[10] Cabrera additionally alleges a rescission claim for relief on the ground that the Finder's Agreement was unlawful because Iguaçu was not licensed to effect transactions in securities.  Thus, Cabrera also bears the initial burden of establishing that no issue of material fact exists as to all elements of his claim for relief.

1  Cir. 2008) (internal citations omitted).)

2  When the defendant has produced sufficient evidence in support of its affirmative defense,
3  the burden of production shifts to the plaintiff to come forward with specific facts showing that
4  there is a genuine issue for trial.  (*Ray Communications, Inc. v. Clear Channel Communications,*
5  *Inc.*, 673 F.3d 294, 299 (4th Cir. 2012) (internal citations and quotations omitted).)  However,
6  where the movant fails to fulfill its initial burden of providing admissible evidence of the material
7  facts entitling it to summary judgment, the motion must be denied, even if no opposing evidentiary
8  matter is presented, for the non-movant is not required to rebut an insufficient showing.  (*Id.,* at
9  299-300.)

10  Here, Cabrera has utterly failed to show that his evidence is "so powerful that no
11  reasonable jury would be free to disbelieve it."  (*see Shakur*, 514 F.3d at 890.)  Therefore, he has
12  failed to meet his initial burden of providing facts entitling him to summary judgment and his
13  motion must be denied.

## IV. THE QUOTAS PURCHASED BY ADM WERE NOT SECURITIES

15  Iguaçu's motion demonstrates that the quotas purchased by ADM were not "securities"
16  under either federal or California law.  (Iguaçu MSJ Memo., at 6-15.)  Iguaçu noted that the
17  securities laws turn on the "economic realities" underlying a transaction, not on the label or the
18  name, and that nature of an instrument is determined at the time of issuance.  (*Id*., at 6-7 & 14;
19  *Danner v. Himmelfarb*, 858 F.2d 515, 520 (9th Cir. 1988).)  Iguaçu further noted that the Court
20  had already rejected Cabrera's argument that the interests ADM purchased in Limeira constituted
21  "stock" interests.  (*See* Report and Recommendation, at 4:12-13 ("ADM-Brazil had an agreement
22  to purchase quotas—a fact that Mr. Cabrera does not dispute.").)  If any further corroboration were
23  needed, the Declaration of Leonardo Canabrava Turra in support of Iguaçu's MSJ demonstrates
24  that under Brazilian law, the transactions between ADM and Cabrera were required to be
25  submitted in advance to the Brazilian Antitrust Authority ("CADE") for review and CADE
26  specifically authorized ADM to acquire 49% of the quotas in CCEAA and 80% of the quotas in
27  Jatai.  (Canabrava Turra Decl., at 2; Dkt. # 232.)

28  Iguaçu cited authority that the classification of a transaction should be judged by the

original intention of the parties, in order to protect investors who "cannot personally watch the managers of all his interests." (*Slevin v. Pedersen Associates, Inc.*, 540 F. Supp. 437, 441 (S.D.N.Y. 1982) (Looking at the economic realities, the court concluded that "[t]he reality of the situation presented by the instant case is that the plaintiff made an investment in a joint venture with the individual defendant.").)

Iguaçu also cited the case it believes is most closely in point, *Keith v. Black Diamond Advisors, Inc.*, 48 F. Supp. 2d 326, 328 (S.D.N.Y, 1999), where the plaintiff first purchased interests in corporate entities and later obtained a 25% member interest in an affiliated LLC. The court found that the since the plaintiff clearly intended to maintain some degree of control in the LLC his interests were not securities because at the time of his investment, he did not intend to be a passive investor. (*Id.,* at 333-34.)

For the same reasons, the LLC interests purchased by ADM were not securities under California law, since Iguaçu has shown that "all of the members [Cabrera and ADM] are actively engaged in the management of the limited liability company . . . ." (Cal. Corp. Code § 25019.)

Cabrera's argument would turn the "economic realities" test on its head, entirely disregarding the policies of the securities laws. Instead of analyzing the interests that ADM actually purchased (which were unquestionably "quotas" in the LLCs), he invites the Court to delve into the details of preliminary transactions Cabrera agreed to undertake in order to "set the stage" for ADM's quota purchases. As to CCEAA/Limeira, which was then a stock company, Cabrera agreed to purchase the shares held by Bardana and his wife Angela Cabrera, and to convert the company to an LLC before selling 49% of the LLC quotas to ADM. In the case of Jatai, Cabrera and his brother Alexandre agreed to form a new operating company (Bela Vista) and to contribute their Jatai interests to Bela Vista, with Cabrera also buying out all LLC quotas held by both his wife and brother before selling 80% of the quotas to ADM. (Cabrera Mot., at 11-12.)

Cabrera compares these preliminary steps to the situation in *S.E.C. v. M&A West, Inc.,* 538 F.3d 1043 (9th Cir. 2008), where the Ninth Circuit held that the defendant could not invoke a "safe harbor" provision of SEC Rule 144 exempting transfers of securities from non-affiliates,

8                                          Case No.:  C 09-0380 RS (NMC)
IGUAÇU'S OPPOSITION TO CABRERA'S MOTION FOR SUMMARY JUDGMENT

1  where the transaction began by converting an affiliate into a non-affiliate as a condition to the
2  closing.  (Cabrera Mot., at 21-22.)  The only common thread between this case and *M&A West* is
3  the presence of stages leading to a final transaction in (alleged) securities.  But Iguaçu did not
4  dictate the structure of the transaction, as did the defendant broker in *M&A West*, did not even
5  have any involvement in how the transaction was structured, and the structure chosen by ADM
6  and Cabrera had nothing to do with trying to make an "end run" around the securities laws, as in
7  *M&A West*.  To the contrary, ADM and Cabrera structured the transactions for their own reasons,
8  entirely unrelated to the possible impact of the U.S. securities laws on the transactions generally,
9  much less on Iguaçu's rights under the Finder's Agreement.  No public policy would be served by
10 penalizing Iguaçu for the particular and unforeseeable manner in which ADM and Cabrera elected
11 to structure their joint venture.

## V.  EQUITABLE DEFENSES PRECLUDE SUMMARY JUDGMENT

13      Even if Cabrera could demonstrate that ADM purchased "securities," his motion cannot be
14 granted in the face of Iguaçu's equitable defenses of unjust enrichment, estoppel, waiver, and
15 unclean hands.  (*See* Answer to Counterclaim Pages 4-6) (Dkt. # 207.)
16      The Ninth Circuit has noted that a claim to void or rescind an agreement under section 20
17 of the Securities Exchange Act is subject to equitable defenses.  (*Royal Air Properties, Inc. v.
18 Smith*, 312 F.2d 210, 213-14 (9th Cir. 1962) ("We see no reason why the ordinary defenses of
19 estoppel and waiver should not be applicable.  The purpose of the Securities Exchange Act is to
20 protect the innocent investor, not one who loses his innocence and then waits to see how his
21 investment turns out before he decides to invoke the provisions of the Act."))
22      There is a scarcity of case law on the issue, no doubt because few if any satisfied sellers of
23 securities think to raise a section 20 defense to avoid paying a fee or commission after a successful
24 transaction introduced by the finder.  However, Cabrera failed to invoke the provisions of the
25 securities laws until after having greatly benefited from the transactions with ADM and is not the
26 intended beneficiary of the relevant securities laws.  Therefore, this Court can and should find as a
27 matter of basic fairness and equity that Cabrera has been unjustly enriched, that Cabrera is
28 estopped from denying his obligation under the Finder's Agreement, and that Cabrera is barred

1  under the doctrine of unclean hands from asserting any claims against Iguaçu.

2  **VI.  DAMAGES**

3      **A.  Cabrera's Attempt to Avoid Paying Commissions on $469 Million Brazilian Reais of Commissionable Events is Untenable as a Matter of Law**

4

5  In his motion, Cabrera posits that he is entitled to partial summary judgment on damages

6  relating to commissionable events totaling $469 Million Brazilian Reais.  Cabrera cites *Weinberg*

7  *v. Whatcom County*, 241 F.3d 746, 751 (9th Cir. 2001) for the general proposition that

8  "[s]ummary judgment is proper where the nonmoving party has no expert witnesses or documents

9  providing competent evidence from which the jury could fairly estimate damages."  That argument

10 has no bearing on this case because Iguaçu, presented Mr. Sterck to testify both as its PMK and

11 later as its expert witness, and he has offered competent evidence from which the jury could fairly

12 estimate damages.  By contrast, the plaintiff in *Weinberg*, did not timely present any expert

13 witness or documentary evidence to support his damages.  (*Weinberg*, 241 F.3d at 751.)

14 Mr. Sterck presented and testified concerning his written expert report, which included two

15 excel charts.  Cabrera attacks the second chart, derived from information which, in Mr. Sterck's

16 view, is "likely to fall within the definition of a commissionable transaction according to the

17 Finder's Agreement" but that additional corroboration or authentication would be helpful.  Far

18 from Cabrera's claim that the calculations in second chart ("Summary #2") are "unreliable" or

19 based on "uncertain" evidence, the Sterck Report specifically identified the bases and

20 documentary evidence he relied upon in articulating damages in Summary #2, including

21 summaries produced by ADM, documents from Brazil's Central Bank (Banco Central do Brasil),

22 documents found in the Brazilian public domain reflecting certain aspects of the ADM/Cabrera

23 joint venture, and Cabrera's own discovery responses -- but which contain discrepancies with

24 other documents produced in discovery.[11]

25 / / /

26 ---

27 [11] *See* Sterck Report, Exhibit E to Ball Decl., Dkt. # 235, Pages 67-69, and 71 [chart #2] of 126.

28

1    Cabrera cites CACI Jury Instruction 350 (2012) for the general proposition that it is the plaintiff's burden to prove damages in a breach of contract case but ignores (or avoids) any analysis of the annotations for that instruction, which acknowledge that the law requires only that *some reasonable basis* of computation be used. (*Acree v. General Motors Acceptance Corp.,* 92 Cal. App. 4th 385, 398 (2001) ("Where the fact of damages is certain, as here, the amount of damages need not be calculated with absolute certainty. The law requires only that some reasonable basis of computation be used, and the result reached can be a reasonable approximation.")) Here, where Mr. Sterck's Summary #2 damages calculations are based on documents from ADM summaries, documents from the Central Bank in Brazil, records in the public domain, and Cabrera's own discovery responses, there is a reasonable basis for the computation of damages under *Acree*. It is for the jury to determine whether there is a sufficient quantum of evidence to award any one or more of these categories of damages to Iguaçu, and summary adjudication is untenable as a matter of law.[12]

Given that the best source of relevant information on damages would likely be in Cabrera's (and ADM's) possession, it bears repeating that Cabrera consistently sought to avoid producing the most elementary financial information relating to the joint venture. (Yu Decl., at ¶¶ 2, 3) Prior to the October 1, 2012 discovery cut-off, Cabrera produced a total of 1,328 pages of documents. After the hearing on the parties' discovery dispute, Cabrera produced 32,633 pages of documents on October 5, 2012 and represented that Cabrera's counsel was still reviewing additional documents for privilege. (Yu Decl., ¶7, Exh. A.) To date, Cabrera still has not produced the "additional documents" or a privilege log, and Iguaçu has no idea regarding the nature of the documents that remain to be produced. Accordingly, Mr. Sterck appropriately articulated that Iguaçu reserved the right to supplement the damages analysis should additional information prove relevant to Iguaçu's damages. (Sterck Report, Dkt. #235, Page 69 of 126.)

---

[12] *Compare*, *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988) ("Summary judgment is appropriate where appellants have no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages.")

1  Against this factual background, Cabrera's argument that summary judgment should be granted in
2  his favor on damages, when Cabrera's purposeful failure to produce financial records is the very
3  reason for the caveats set forth in Summary #2 about which Cabrera now complains, is not only
4  untenable, it is pure hubris.

5  Cabrera's challenges to Mr. Sterck's methodology or substantive opinions are not properly
6  brought by a motion for summary judgment. (*U.S. v. Union Pacific R. Co.*, 565 F.Supp.2d 1136,
7  1150 n. 22 (E.D. Cal. 2008) ("Challenges to an expert's methodology and reliability are properly
8  considered at the time of trial by motions in limine. . . . Challenges to an expert's substantive
9  opinions are the proper subject of cross-examination; such issues are not appropriate for resolution
10 on summary judgment."); *see also Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir.
11 2007) (district court's focus on the helpfulness rather than the reliability of expert testimony
12 "mingled the analysis required by Federal Rule of Evidence 702 for the admissibility of expert
13 testimony and Federal Rule of Civil Procedure 56 for summary judgment.").)

## VII.  CONCLUSION

For the reasons discussed above, Cabrera's motion for summary judgment or partial summary judgment must be denied.

DATED: November 29, 2012           Respectfully submitted,

FITZGERALD ABBOTT & BEARDSLEY LLP
Robert R. Cross

SIDEMAN & BANCROFT LLP
Constance J. Yu
Ellen P. Liu


By:    */s/ Constance J. Yu*
       Constance J. Yu
       Attorneys for Plaintiff
       IGUAÇU, INC.

6620-1\1620751v1