1  EDWARD P. SANGSTER (State Bar No. 121041)
   ed.sangster@klgates.com
2  MATTHEW G. BALL (State Bar No. 208881)
   matthew.ball@klgates.com
3  CLAUDIA A. QUIROZ (State Bar No. 254419)
   claudia.quiroz@klgates.com
4  **K&L GATES LLP**
5  Four Embarcadero Center, Suite 1200
   San Francisco, California 94111
6  Telephone: (415) 882-8200
   Facsimile:  (415) 882-8220
7
8  Attorneys for ANTONIO CABRERA MANO FILHO

9                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
10  IGUAÇU, INC.,

11                 Plaintiff,                    Case No. C 09-0380 RS (NMC)

12         v.                                    **ANTONIO CABRERA MANO FILHO'S
                                                 MEMORANDUM IN OPPOSITION TO
13  ANTONIO CABRERA MANO FILHO,                  PLAINTIFF IGUAÇU, INC.'S MOTION
                                                 FOR PARTIAL SUMMARY JUDGMENT**
14                 Defendant.
15                                               Judge:  Honorable Richard Seeborg
                                                 Date:   December 20, 2012
16                                               Time:  1:30 p.m.
                                                 Court:  Courtroom 3, 17th Floor
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

**Page(s)**

INTRODUCTION .................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

     I.     In Economic Reality, the CCEAA (Limeira) Transaction Was a
            Sale of Stock for Cash, and Thus Was a Quintessential Securities
            Transaction Under Federal Law .............................................................................. 2

     II.    The Economic Reality of the Jataí transaction is that it Was a Sale
            of an  "Investment Contract" that Qualifies as a Security Under
            Federal Law ............................................................................................................ 9

     III.   The Interests in CCEAA and Jataí are Securities Under California Law ................... 11

     IV.   There is No "Sophisticated Purchaser" Exception to the Definition
            of "Security" or to the Broker Registration Requirements Under the
            Exchange Act or California Law, and in Any Event, It Was Mr. Cabrera
            Who Seeks and Who Needed the Protections of the Securities
            Laws, Not ADM ...................................................................................................... 12

CONCLUSION ....................................................................................................................... 17

i

**CABRERA'S MEMO. IN OPPOSITION TO PLAINTIFF IGUAÇU, INC.'S MOTION FOR PARTIAL
SUMMARY JUDGMENT; Case No. C-090380 RS (NMC)**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Danner v. Himmelfarb*
   858 F.2d 515 (9th Cir. 1988).........................................................................................6

*Eastside Church of Christ v. National Plan, Inc.*
   391 F.2d 357 (5th Cir. 1968)..........................................................................................13

*In re Scientific Control Corporation Securities Litigation*
   71 F.R.D. 491 (S.D.N.Y. 1976) ......................................................................................13

*Keith v. Black Diamond Investors, Inc.*
   48 F. Supp. 2d 326 (S.D.N.Y. 1999)................................................................................8

*Landreth Timber Co. v. Landreth*
   476 U.S. 681 (1985) .........................................................................................................8

*Moore v. Stelling*
   52 Cal. App. 2d 766, 772-773 (1942) ............................................................................12

*Moreland v. Department of Corporations*
   194 Cal. App. 3d 506 (1987)...........................................................................................12

*Morrison v. National Australia Bank Ltd.*
   130 S. Ct. 2869 (2010) .....................................................................................................7

*Oil Lease Service, Inc. v. Stephenson*
   162 Cal. App. 2d 100 (1958)...........................................................................................12

*People v. Woolson*
   181 Cal. App. 2d 657 (1960)...........................................................................................12

*Reiswig v. Dept. of Corp.*
   144 Cal. App. 4th 327 (2006) .........................................................................................11

*S.E.C. v. M&A West, Inc.*
   538 F.3d 1043 (9th Cir. 2008)......................................................... 1, 4, 5, *passim*

*S.E.C. v. W.J. Howey Co.*
   328 U.S. 293 (1946) ......................................................................................................8, 9

*Slevin v. Pedersen Associates, Inc.*
   540 F. Supp. 437 (S.D.N.Y. 1982) ..............................................................................7, 12

## OTHER AUTHORITIES

15 United States Code
   § 78cc(b) .........................................................................................................................13
   § 78o(a)(10).....................................................................................................................13
   § 78o(b)(8) ......................................................................................................................14
   § 78oc(b) .........................................................................................................................13

California Corporations Code
 § 25019 .................................................................................................... 12
 § 25102(f) ................................................................................................ 13

Financial Industry Regulatory Authority
 Rule 2010 .................................................................................................. 15
 Rule 2020 .................................................................................................. 15

Securities and Exchange Act of 1933
 § 4a(2) ...................................................................................................... 13
 § 5(a) .......................................................................................................... 4
 § 5(c) .......................................................................................................... 4
 § 15(b)(8) .................................................................................................. 14
 § 15A .......................................................................................................... 14
 § 29(b) ...................................................................................................... 13
 Regulation D ............................................................................................ 13
 Rule 144 .................................................................................................. 4, 5
 Rule 144(k) ................................................................................................ 6
 Rule 506 .................................................................................................... 13

**CABRERA'S MEMO. IN OPPOSITION TO PLAINTIFF IGUAÇU, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT; Case No. C-090380 RS (NMC)**

**INTRODUCTION**

This Court should deny Iguaçu's Motion for Partial Summary Judgment because it is entirely based on legal arguments that are fundamentally flawed.  Specifically, Iguaçu contends that the Limited Liability Company ("LLC") interests that ADM purchased were not securities under either federal or state law, because ADM was a sophisticated investor that purchased interests giving it the right to participate in management of the LLCs, and actively participated in management thereafter.

Iguaçu's argument fails in part because it considers only the intended post-closing result of the transaction, rather than the economic reality of the transaction as a whole.  The question is not what ADM intended to do or did with the interests it purchased, but what sellers actually sold, and in reality what ADM bought with the cash it paid at closing.  Here, the economic reality of the transaction was that the sellers, including a third-party minority investor, sold what they owned at the time they entered the Quota Purchase Agreements ("QPAs") – which was common stock and *limitada* interests that qualified as "securities" under federal and state law.  ADM paid cash to the sellers in proportion to the sellers' ownership at that time for those interests.  Three of the sellers who received cash paid at the closing of the transaction had no post-closing interest or role.  Iguaçu claims commissions on all of those sales.

The multiple stages of the process purportedly changing the securities to interests in different entities were implemented simultaneously at the transaction closing, and were contingent upon the closing of the transaction.  Controlling Ninth Circuit precedent requires this Court to view the transaction in its entirety, rather than focusing on the post-closing result of a simultaneous, multiple-stage, contingent transaction such as this one.  *S.E.C. v. M&A West, Inc*, 538 F.3d 1043, 1053-54 (9th Cir. 2008).  Properly viewed in its entirety, the transaction was a sale of securities for cash.  Iguaçu's motion should be denied for this reason alone.

Iguaçu's Motion also fails because the definition of "security" under federal or California law does not change based on the purported sophistication of the purchaser, nor is there a statutory exception from broker-dealer registration under federal or California law for brokers who effect transactions for allegedly sophisticated parties.  Thus, ADM's sophistication is irrelevant to Mr. Cabrera's defense under the federal and state securities laws.  In any event, in dealing with this

1

1   particular unregistered broker, ADM's purported sophistication is a red herring.  Here, it was Mr.

2   Cabrera, rather than ADM, who needed the protection that broker registration affords against an

3   unscrupulous broker.

**ARGUMENT**

4

I.   **In Economic Reality, the CCEAA (Limeira) Transaction Was a Sale of Stock for Cash,**

5   **and Thus Was a Quintessential Securities Transaction Under Federal Law.**

6

7           From February 18, 2008, through December 2, 2008 – the period when the ADM transaction

8   was negotiated and closed – what Iguaçu refers to as "Limeira" was an entity called Cabrera Central

9   Energética Açúcar e Álcool S.A. ("CCEAA").  During this time, CCEAA had the corporate form of a

10  *sociedade anônima* (S.A.).  Declaration of Bruno Meyerhof Salama in Support of Defendant

11  Cabrera's Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment

12  ("Salama MSJ Decl.") ¶ 3 [Dkt. No. 236].  A *sociedade anônima* can be analogized with American

13  corporations for most purposes of law.  *Id.*  The corporate capital of CCEAA during the period from

14  February 18, 2008, through December 2, 2008, was divided into common stock.  *Id.* ¶ 6.

15          From February 18, 2008, through December 2, 2008, CCEAA had three shareholders:  Mr.

16  Cabrera, who owned approximately 66% of CCEAA's shares; Bardana Bio Ethanol Participações,

17  S.A. ("Bardana"), which owned 33% of the shares,[1] and Angela Cabrera, Mr. Cabrera's wife, who

18  owned .001% of the shares.  Declaration of Wanderley Fernandes in Support of Defendant's Motion

19  for Summary Judgment, or, in the Alternative, Partial Summary Judgment ("Fernandes MSJ Decl."),

20  Exh. A (CCEAA Quota Purchase Agreement, Recitals ¶ A, B) [Dkt. No. 237]; Declaration of Shobha

21  Seturam in Support of Plaintiff's Renewed Motion for Right to Attach Order ("Seturam

22  Reconsideration Decl."), Exh. G-2 (CCEAA Closing Memo. ¶ 1(b)) [Dkt. No. 143].[2]

---

23  [1] Incredibly, Iguaçu does not even mention Bardana in its brief, despite Bardana's significance to the
    issue before the Court.

24

25  [2]  The parties also refer to Bardana as "Banif."  Further, the QPA and the CCEAA Closing
    Memorandum are not consistent in describing Bardana's ownership percentages.  The QPA states
    Bardana's ownership in CCEAA as 39%.  The CCEAA Closing Memorandum states Bardana's
26  ownership percentage as 33%.  The inconsistency is not material to Mr. Cabrera's argument here.
    For clarity, Defendant Cabrera notes here that Defendant used the percentages from the CCEAA
27  QPA in Defendant's Motion for Summary Judgment.  However, on further review, it appears that the
    percentages as stated in the CCEAA Closing Memorandum are more likely correct.

28

1    The CCEAA QPA provided for the transfer of interests in CCEAA to ADM in a multi-stage

2    process.

3    First, Mr. Cabrera was to agree to purchase Bardana's shares and purportedly pay the

4    purchase price in full on or before the closing date but before closing.  The eventual agreement was

5    contingent upon closing of the QPA, and contingent upon payment by ADM.  In fact, ADM paid $25

6    million BRL directly to Bardana as part of the closing.  Declaration of Wanderley Fernandes in

7    Support of Defendants' Motion to Vacate Right to Attach Order and Order for Issuance of Writ of

8    Attachment ("Fernandes RTAO Decl.") ¶ 8 [Dkt No. 64]; Fernandes MSJ Decl. Exh. A (CCEAA

9    QPA § 2.1) [Dkt. No. 237]; Seturam Reconsideration Decl., Exh. G-2 (CCEAA Closing Memo.

10   ¶1(f)) [Dkt. No. 143].

11   Second, Mr. and Ms. Cabrera, immediately after Mr. Cabrera purchased Bardana's shares, but

12   before closing, were to convert CCEAA from an S.A. into a *limitada*, an entity which can be

13   analogized to an American LLC for most purposes of law.  Fernandes MSJ Decl. Exh. A (CCEAA

14   QPA § 2.2) [Dkt. No. 237]; Salama MSJ Decl. ¶ 4 [Dkt. No. 236].

15   Third, ADM was to purchase a portion of the new *limitada* for cash, paying more than $54

16   million BRL, a sum that included BRL $25 million going to Bardana, with the balance going to Mr.

17   Cabrera and his wife.  Fernandes MSJ Decl. Exh. A. (CCEEA QPA § 4.1) [Dkt. No. 237]; Seturam

18   Reconsideration Decl., Exh. G-2 (CCEAA Closing Memo. ¶1(b)-(h)) [Dkt. No. 143].  Bardana

19   received no interest in the new *limitada* and Ms. Cabrera's interest was bought out at closing.

20   Seturam Reconsideration Decl. Exh. G-2 (CCEAA Closing Memo. ¶ 1(b), (d)-(f)) [Dkt. No. 144];

21   Fernandes MSJ Decl. Exh. A (CCEAA QPA ¶ 4.1) [Dkt. No. 237].

22   The CCEAA transaction was to close simultaneously with and was contingent upon the

23   closing of the Jataí transaction.  *See* Fernandes MSJ Decl. Exh. A (CCEAA QPA Recitals ¶ E

24   [simultaneous nature of CCEAA and Jataí transactions]; ¶ 11.6 [making the fulfillment of all

25   conditions precedent of the quota purchase of the operating company (Jataí) a condition of the

26   CCEAA QPA]; ¶ 12.5 [same]) [Dkt. No. 237]; Seturam Reconsideration Decl. Exh. F-1 (Jataí QPA

27   Recitals ¶ E [Jataí transaction intended to be simultaneous with CCEAA transaction]; ¶3(b) ["the

28   parties . . . acknowledge  that the closing of the transactions set forth in the Quota Purchase

3

**CABRERA'S MEMO. IN OPPOSITION TO PLAINTIFF IGUAÇU, INC.'S MOTION FOR PARTIAL
SUMMARY JUDGMENT; Case No. C-090380 RS (NMC)**

1    Agreement of CCEAA are part of the overall agreement among them"]; ¶ 12.14 [fulfillment of

2    CCEAA QPA is condition precedent to close]) [Dkt. No. 144].

3         None of the stages was implemented until closing.  Documents to implement these multiple

4    stages were delivered at the simultaneous closing when all sellers, including Bardana, were paid

5    directly by ADM.  Seteram Reconsideration Decl. Exh. G-2 (CCEAA Closing Memo. ¶ 1(e)-(g))

6    [Dkt. No. 144]; Fernandes RTAO Decl. ¶s 7-8 [Dkt. No. 64].

7         When the transaction closed, Mr. Cabrera owned 51% of the restructured CCEAA, and ADM

8    owned 49 %.  Seturam Reconsideration Decl. Exh. G-2 (CCEAA Closing Memo.) [Dkt. No. 144].

9    Ms. Cabrera and Bardana had no interest.  *Id.*  Importantly, ADM did not invest any money into the

10   new restructured entity at closing.  *Id.*  All cash paid went effectively to purchase the existing

11   interests of CCEAA from the respective sellers, Bardana, Mr. Cabrera, and Angela Cabrera.[3]

12        In asserting that ADM did not purchase "securities" for the purposes of federal and state

13   securities laws, Iguaçu directs this Court to look at only the last stage of the simultaneous multi-stage

14   transaction – the purchase of quota interests in the reorganized CCEAA *limitada* – and even more

15   importantly, the intentions of the parties as to the management of the *limitada* after the transaction

16   had closed.  Iguaçu's position is virtually on all fours with the position of the defendant in *S.E.C. v.*

17   *M&A West, Inc.*, *supra*, 538 F.3d 1043, and this Court should reject Iguaçu's position here as the

18   Ninth Circuit rejected the position of the defendant in the *M&A West* case.

19        In *S.E.C. v. M&A West, Inc.*, the S.E.C. alleged that a defendant, Stanley Medley, had violated

20   Sections 5(a) and 5(c) of the Securities Act of 1933, as amended, by selling unregistered securities as

21   an underwriter when registration was required.  *Id.* at 1049.  Defendant Medley asserted that a "safe

22   harbor" exemption found within Rule 144 under the Securities Act permitted him to sell the

---

23   [3] The total purchase price in the CCEAA transaction was $54,965,599 BRL.  Bardana received
     $25,000,000 BRL, Ms. Cabrera received $1,307 BRL, and Mr. Cabrera received the balance.
24   Fernandes MSJ Decl. Exh. A (CCEAA QPA § 4) [Dkt. No. 237]; Seturam Reconsideration Decl.,
     Exh. G-2 (CCEAA Closing Memo. ¶1(f)) [Dkt. No. 143].  The cash paid at closing was BRL
25   $25,000,000 to Bardana and $10,965,599 to Mr. and Ms. Cabrera.  Seturam Reconsideration Decl.,
     Exh. G-2 (CCEAA Closing Memo. ¶1(f),(m)) [Dkt. No. 143].  The balance of the purchase price was
26   applied to or credited against obligations of Mr. Cabrera pursuant to the QPA. Fernandes MSJ Decl.
     Exh. A (CCEAA QPA § 4.2) [Dkt. No. 237].

27   .

28

4

1   unregistered securities without registration.  Rule 144 would have allowed Medley to sell

2   unregistered securities without violating securities laws, provided he had purchased them from

3   persons who were not "affiliates" (or were "non-affiliates") of the issuer of the securities.  *Id.* at

4   1050-51.  Medley argued that he was entitled to the safe harbor of Rule 144, because he had

5   purchased the securities from "non-affiliates" under that Rule.  *Id.*

6        The problem the Ninth Circuit had with Medley's argument was that the persons from whom

7   Medley purchased the securities changed from "affiliates" to "non-affiliates" as part of a multi-stage

8   transaction, at which all stages happened simultaneously, and were contingent upon the closing of the

9   entire transaction.  *Id.* at 1052-1053.  For example, one of the three reverse merger transactions at

10  issue in the *M&A West* case, the Digital Bridge transaction, proceeded as follows.  In step one of the

11  Digital Bridge transaction, the parties agreed that one party to the reverse merger, Black Stallion,

12  would issue 20 million new shares to the existing Digital Bridge shareholders in exchange for the

13  outstanding Digital Bridge Stock (the "Reorganization Agreement").  *Id.* at 1048.  The

14  Reorganization Agreement contained a condition subsequent clause which assumed the future closing

15  of several stock purchase agreements, including an agreement between Defendant Medley and the

16  former majority shareholder of Black Stallion, Ken Kurtz.  *Id.* at 1048-1049 & n.4.  If those future

17  stock purchase agreements failed to close, the transactions could be unwound.  *Id.* at 1048.  The

18  closing of the Reorganization Agreement and the Stock Purchase Agreement were scheduled for the

19  same day, January 31, 2000.  *Id.* at 1048-1049.  Medley later sold the unregistered Black Stallion

20  stock he purchased from Kurtz to the public for a profit of more than $1 million.  *Id.* at 1049.

21       Medley's position was that, in the course of the Reorganization Agreement, Kurtz went from

22  being an affiliate to a non-affiliate.  *Id.* at 1051 (it was "undisputed that the persons from whom

23  Medley purchased his shares were affiliates of the public shell corporation prior to the reverse

24  mergers"), 1052 (stock purchase, and act which transformed affiliate into a non-affiliate took place in

25  separate agreements).  The Ninth Circuit upheld the trial court's rejection of Medley's position,

26  because both the challenged securities purchase, as well as the conversion of the seller from an

27  "affiliate" to a "nonaffiliate" occurred as part of the same transaction, even though it may have had

28  multiple stages.  *Id.* at 1052-1053.  The Ninth's Circuit's reasoning is particularly pertinent here:

> The Supreme Court has long instructed that securities law places emphasis on economic reality and disregards form for substance. [*citations*].  Where a single transaction accomplishes both a change in status from an affiliate to a nonaffiliate and a transfer of stock from that person or entity, the transfer must be viewed as a transfer from an affiliate for the purposes of determining Rule 144(k) eligibility.

*Id.* at 1053.

Iguaçu's position here is exactly the same as Medley's position in the *M&A West* case.  Here, Iguaçu seeks to rely on the "intended ultimate outcome"[4] of a simultaneous, multi-stage, contingent transaction to assert that what the sellers sold and ADM purchased were not securities, even though CCEAA was reorganized from the Brazilian equivalent of a corporation, with common stock and multiple shareholders, to the Brazilian equivalent of an LLC, with two quota-holders, simultaneously with the closing.  Moreover, Iguaçu asserts that the post-closing intentions of the parties are relevant to the inquiry.  Under *M&A West*, this Court should reject Iguaçu's position, because the economic reality of this transaction is that of a sale of common stock, by several shareholders, for cash.

This conclusion is inescapable if the Court "follows the money."  In the CCEAA transaction, nearly half of the consideration paid in the deal was paid to Bardana ($25 million of the approximately $54 million Reais paid by ADM) and to Ms. Cabrera ($1,307 Reais)[5] – two parties who not part of the alleged joint venture going forward.  One can legitimately ask the question – in economic reality, for what were these parties paid?  Obviously, the answer is that ADM paid these parties for their common stock in CCEAA.

Iguaçu's authorities are not to the contrary.  Iguaçu cites *Danner v. Himmelfarb*, 858 F.2d 515, 520 (9th Cir. 1988), for the proposition that the nature of an instrument is determined at the time of issuance.  Plaintiff's MSJ at 6:19-21 [Dkt. No. 231].  It is hard to see how this principle of law helps Iguaçu.  The purported conversion of CCEAA from a corporation to a *limitada* and the purported issuance and sale of the *limitada* interests were simultaneous at closing together with the direct payment to Bardana and the buyout of Ms. Cabrera and partial buyout of Mr. Cabrera.  *See*

---

[4]  This is the wording used in Plaintiff's brief.  *See* (Memo. In Support of Motion of Plaintiff Iguaçu for Partial Summary Judgment ("Plaintiff's MSJ") at 2:7) [Dkt. No. 231].

[5] *See* Fernandes MSJ Decl. Exh. A (CCEAA QPA § 4.1); footnote 3, *supra*.

6

CABRERA'S MEMO. IN OPPOSITION TO PLAINTIFF IGUAÇU, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT; Case No. C-090380 RS (NMC)

1   Plaintiff's MSJ at 5:10-12 ("All quota transfers from previous members of Limera and Jataí were to

2   occur during ADM's purchase of its quotas") [Dkt. No. 231].[6]  Bardana's purported pre-closing sale

3   was conditional on ADM closing and payment, and Mr. Cabrera did not pay Bardana prior to closing.

4   Seturam Reconsideration Decl. Exh. G-2 (CCEAA Closing Memo. ¶ 1(e)-(g) [Dkt. No. 144];

5   Fernandes RTAO Decl. ¶ 7-8 [Dkt. No. 64].  In fact, the issuance of the new *limitada* interests were

6   only authorized after the closing.  Seturam Reconsideration Decl. Exh. G-2 (CCEAA Closing Memo.

7   ¶ 1 [describing the various steps taken to close the transaction, which did not include the issuance of

8   new *limitada* interests] & ¶ 4 [describing the transfer of quotas to ADM] [Dkt. No. 144].  The issue

9   here is the nature of the instrument that was, in economic reality, sold to ADM.  As discussed above,

10  this was common stock.

   Iguaçu further cites *Slevin v. Pedersen Associates, Inc.*, 540 F. Supp. 437, 441 (S.D.N.Y.

11

12  1982), for the proposition that the intent of the parties is relevant to whether a particular transaction is

13  a securities transaction or not.  Plaintiff's MSJ at 7:14-27; 9:20-10:16 [Dkt. No. 231].  *Slevin* cannot

14  trump the Ninth Circuit's decision in *M&A West*, and is irrelevant for that reason alone.  However,

15  *Slevin* is also distinguishable, because the facts of that case showed that the individual parties to the

16  transaction intended to enter a partnership.  No stock certificates were even issued.  *Slevin*, 540 F.

17  Supp. at 441.

   Moreover, unlike *Slevin*, which involved several individuals who essentially entered into

18

19  business together, here, two of the three shareholders were bought out and had no post-closing role.

   Further, as discussed above, it is undisputed that from February 18, 2008, through December

20

21  2, 2008 (the closing date of the CCEAA transaction), CCEAA was the Brazilian equivalent of a

22  corporation that had issued common stock to three shareholders.  Salama MSJ Decl. ¶¶ 3, 6 [Dkt. No.

23  236]; Fernandes MSJ Decl., Exh. A (CCEAA Quota Purchase Agreement, Recitals ¶ A, B) [Dkt. No.

24  237].  Under Brazilian law, common stockholders in the Brazilian equivalent of a corporation have

25  the right to receive dividends, and the right to supervise the corporation's bodies, among others.

26  _____

27  [6]  Iguaçu argues in two footnotes that the transfers of quotas between Mr. Cabrera and family
    members were extraterritorial transactions under *Morrison v. National Australia Bank Ltd.*, 130 S. Ct.
    2869 (2010) and its progeny.  *See* Plaintiff's MSJ at n.4, 6.  This argument misses the point.  The
    relevant purchase and sale is ADM's purchase of securities from Mr. Cabrera and others.

28

1  Salama MSJ Decl. ¶ 3 [Dkt. No. 236].  Under the Exchange Act, the definition of security includes

2  "any . . . stock."  15 U.S.C. § 78o(a)(10).  Where the investment involved is traditional stock,

3  meaning it is called "stock" and carries those characteristics usually associated with common stock,

4  such as (i) the right to receive dividends contingent upon an apportionment of profits; (ii)

5  negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in

6  proportion to the number of shares owned; and (v) the capacity to appreciate in value, there is no

7  need to look beyond the characteristics of the investment to determine that securities laws apply.

8  *Landreth Timber Co. v. Landreth*, 476 U.S. 681, 686, 690 (1985).  In other words, where an

9  instrument is called "stock" and has the characteristics of stock, the United States Supreme Court

10  holds that the parties' intentions are irrelevant.

11      Iguaçu also cites *Keith v. Black Diamond Investors, Inc.*, 48 F. Supp. 2d 326 (S.D.N.Y. 1999),

12  as "instructive," on the question before the Court.  Plaintiffs' MSJ at 11:1-20.  It is not.  The question

13  before the Court in *Keith* was whether certain interests in a NY Limited Liability Company ("LLC")

14  qualified as "investment contracts" under the Supreme Court's test in *S.E.C. v. W.J. Howey Co.*, 328

15  U.S. 293 (1946).  The *Keith* Court held they did not, because the plaintiff had the power to manage

16  the LLC, and thus could not satisfy the fourth element of the *Howey* test, that "the expectation of

17  profit be derived from the entrepreneurial events of others."   *Keith*, 48 F. Supp. 2d at 332-334.  Here,

18  even if the *Keith* opinion could trump the opinion of the Ninth Circuit – which it cannot – the issue

19  here does not turn on whether the parties intended that both Mr. Cabrera and ADM would have

20  management authority over the post-closing *limitada*.  The issue is whether the transaction as a whole

21  was or was not a sale of securities in economic reality.  As discussed at length above, the answer is

22  clear – it was a sale of stock.[7],[8]

___

23  [7]  Iguaçu also argues in a footnote that an "unusual instrument" is not a security unless it was
24  designed to be traded on a public market or widely traded.  Plaintiff's MSJ n.5.  Whatever the
   validity of the argument, the CCEAA transaction did not involve any "unusual instruments", but
   involved instead the Brazilian equivalent of common stock in a corporation.

25
26  [8]  Defendant believes that the quota interests that were the specific subject of the final stage of the
   CCEAA QPA were securities under both federal and state law.  However, because this Court must
27  consider the economic reality of the transaction as a whole, it is not necessary to set forth
   Defendant's reasons for the purpose of this Motion.

28

1

2

## II. The Economic Reality of the Jataí transaction is that it Was a Sale of an "Investment Contract" that Qualifies as a Security Under Federal Law.

3    Between the period of November 23, 2007, to December 2, 2008, Jataí was a limited liability

4 quota company (*sociedade limitada*).  Salama MSJ Decl. at ¶ 7 [Dkt. No. 236].  A *sociedade*

5 *limitada*, or simply *limitada*, is a corporate form that is analogous to an American LLC for most

6 purposes of law.  *Id.* at ¶ 4.  Ownership of a *limitada* is divided into *quotas*, and holders of *quotas* can

7 be analogized with the holders of membership interests in an American LLC.  *Id.*  From November

8 23, 2007, through December 2, 2008, Mr. Cabrera had no management rights or role in Jataí.  *Id.* at ¶

9 8; Supplemental Declaration of Antonio Cabrera Mano Filho in Support of Defendant's Motion to

10 Vacate RTAO Order and Order for Issuance of Writ of Attachment ¶ 1 [Dkt. No. 83]; Declaration of

11 Antonio Cabrera Mano Filho in Opposition to Motion for Reconsideration of Denial of Issuance of

12 Right to Attach Order and Order for Writ of Attachment ¶ 12 & Exh. A & B (Jataí's Articles of

13 Association and Amended Articles of Association) (providing that Alexandre shall be the only person

14 responsible for the management of Jataí) [Dkt. No. 165].

15    Because Mr. Cabrera had no management rights or role in Jataí, any profit that Mr. Cabrera

16 expected would "be derived from the entrepreneurial efforts of others."  *Howey*, 328 U.S. at 298-99.

17 Accordingly, from November 23, 2007, through December 2, 2008, the interests that Mr. Cabrera

18 held in Jataí were securities under federal law.

19    Prior to the closing, Mr. Cabrera's brother, Alexandre, owned 80% of the quotas in Jataí.

20 Seturam Reconsideration Decl. Exh. F-1 (Jataí QPA Recitals ¶ A) [Dkt. No. 144].  Like CCEAA

21 QPA, the Jataí QPA provided for a multistage process.  First, Alexandre agreed to transfer 236,595 of

22 his quotas to Mr. Cabrera, making Mr. Cabrera the majority owner.  *Id.* at Exh. F-1 (Jataí QPA § 2.1).

23 Next, Mr. Cabrera and Alexandre agreed to form a limited liability operating company (eventually

24 called Bela Vista), to which they would contribute their interests in Jataí, so the operating company

25 would own Jataí.  *Id.* (Jataí QPA § 2.2).  They agreed to sell, and ADM agreed to purchase, quotas in

26 the operating company, so that ADM would own 80%, Alexandre would be bought out, and Mr.

27 Cabrera would own the remaining 20%.  *Id.* (Jataí QPA § 3); Plaintiff's MSJ at 5:7-10 [Dkt. No.

28 231].  ADM agreed to pay (and paid at closing), $5,412,000 BRL, with $1 million BRL going to Mr.

9

1  Cabrera, and the rest going to Alexandre.  Seturam Reconsideration Decl. Exh. F-2 (Jataí Closing

2  Memo. ¶ 1(h)) [Dkt. No. 142-2].[9]  Alexandre retained no interest in the new operating company.  *Id.*

3  (Jataí Closing Memo. ¶¶ 2-4).  All of these steps were contingent upon the closing of the Jataí QPA,

4  and occurred simultaneously at closing.  *Id.* (Jataí Closing Memo. ¶ 1).

5          The documents effecting the foregoing steps were prepared, but not delivered to ADM until

6  closing.  Declaration of Wanderley Fernandes in Opposition to Plaintiffs' motion for Reconsideration

7  of Denial of Issuance of Right to Attach Order ("Fernandes RTAO Opp. Recon. Decl.") ¶ 7 [Dkt. No.

8  166].  The stages in the Jataí transaction, like the CCEAA transaction, were simultaneous, and the

9  entire transaction was contingent upon the closing of the CCEAA transaction.  *See* Fernandes MSJ

10  Decl. Exh. A (CCEAA QPA Recitals ¶ E [simultaneous nature of CCEAA and Jataí transactions]; ¶

11  11.6 [making the fulfillment of all conditions precedent of the quota purchase of the operating

12  company (Jataí) a condition of the CCEAA QPA]; ¶ 12.5 [same]); Seturam Reconsideration Decl.

13  Exh. F-1 (Jataí QPA Recitals ¶ E [Jataí transaction intended to be simultaneous with CCEAA

14  transaction]; ¶ 3(b) ["the parties . . . acknowledge  that the closing of the transactions set forth in the

15  Quota Purchase Agreement of CCEAA are part of the overall agreement among them"]; ¶ 12.14

16  [fulfillment of CCEAA QPA is condition precedent to close] [Dkt. No. 237].

17          The reasoning of *M&A West* applies equally to the Jataí transaction.  When viewed as a

18  whole, the economic reality is that ADM purchased interests in Jataí – which under federal law

19  constituted an investment contract that qualifies as a security – for cash.

20          Indeed, the conclusion becomes even clearer if one views CCEAA and Jataí as a single

21  transaction and "follows the money."  The total consideration ADM paid was approximately $60

22  million.  Of this, more than half was paid to buy out Alexandre, Bardana, and Ms. Cabrera – none of

23  ─────────────

[9] The total purchase price in the Jataí transaction was BRL $6,412,000, allocated as follows:
24  $5,412,000 BRL to Alexandre Cabrera and $1,000,000 BRL to Mr. Cabrera.  Seturam
Reconsideration Decl. Exh. F-1 (Jataí QPA § 4.2) [Dkt. No. 144].  All was paid in cash at closing
25  pursuant to these allocations except that BRL $1,000,000 of Alexandre's allocation was applied to or
credited against an obligation of Alexandre pursuant to the QPA.  *Id.* at Exh. F-1 (Jataí QPA § 4.2.)
26  & Exh. F-2 (Jataí Closing Memo. ¶ 1(h)) [Dkt. No. 142-2].

27

28

**CABRERA'S MEMO. IN OPPOSITION TO PLAINTIFF IGUAÇU, INC.'S MOTION FOR PARTIAL
SUMMARY JUDGMENT; Case No. C-090380 RS (NMC)**

1  whom had any involvement in the post-closing, so-called joint venture.  Again, this was a sale of

2  securities, which Iguaçu brokered.[10]

3  **III.    The Interests in CCEAA and Jataí are Securities Under California Law.**

4          Common stock is a security under California securities laws.  Cal. Corp. Code § 25019.  So

5  are LLC interests, unless the person claiming otherwise can prove that all members are actively

6  engaged in the management of the LLC.  *Id.*[11]  As discussed above, the interests of Mr. Cabrera,

7  Angela Cabrera, and Bardana in CCEAA were the Brazilian equivalent of common stock, and Mr.

8  Cabrera's interests in Jataí were the Brazilian equivalent of membership interests in an LLC where

9  Mr. Cabrera did not actively engage in management and Plaintiff has not and cannot produce any

10 evidence that he so engaged prior to the closing.  Thus, on their face, the interests at issue were

11 securities under California law.

12         Despite this clear statutory guidance, Iguaçu asserts that the interests purchased by CCEAA

13 and Jataí are not securities because this Court must consider "the mutual purposes and expectations of

14 ADM and Cabrera" which were that "ADM would acquire an active interest in a joint venture."

15 Plaintiff's MSJ at 14:24-26 [Dkt. No. 231].  In other words, as with their argument under federal law,

16 Iguaçu insists that the Court must focus solely on the "intended ultimate outcome" of the transaction

17 (Plaintiff's MSJ at 2:7), as well as the parties' post-closing intentions and activities.

18         Iguaçu has presented no authority supporting its position.  At the same time, there is no

19 California equivalent to the *M&A West* case.  Even so, this Court should apply the reasoning found in

20 *M&A West* to the state law securities issues, for two reasons.  First, California courts generally

21 recognize the "economic reality" test used by federal courts to determine whether a particular

22 instrument is or is not a security.  *Reiswig v. Dept. of Corp.*, 144 Cal. App. 4th 327, 335 (2006).

23 [10] Defendant contends that the quota interests that were the specific subject of the final stage of the

24 Jataí QPA were securities under both federal and state law.  However, because this Court must
    consider the economic reality of the transaction as a whole, it is not necessary to set forth

25 Defendant's reasons for the contention here.

26 [11] Iguaçu notes that California securities law also includes "investment contracts" as securities.
    Plaintiff's MSJ at 13:8-17.  Since the CCEAA and Jataí interests are the equivalent of common stock

27 and LLC membership interests, there is no need to discuss the concept of "investment contract" under
    state law.  California law, unlike federal law, specifically classifies LLC interests as securities, and

28 thus the Court need perform no analysis under state law to determine whether the LLC-equivalent
    interests involved here are "investment contracts."

11

Second, in the securities context, federal courts' interpretations of securities law have persuasive authority, because the statutory language is similar, and California law itself was patterned after the Exchange Act. *E.g., Moreland v. Department of Corporations*, 194 Cal. App. 3d 506, 512-513 (1987). Accordingly, if faced with this specific question, it is likely that California's highest court would interpret California securities law consistently with the Ninth Circuit's decision in *M&A West*.

Iguaçu's authorities are distinguishable. None of Iguaçu's authorities involve purchases of common stock. Similarly, none of Iguaçu's authorities involve LLC interests that are outside the definition of "security" in 25019. All of Iguaçu's cases instead involve various types of "investment contracts" where the question is whether the transaction in question fell within the California law definition of "investment contract." *Moreland*, 194 Cal. App. 3d at 516 (Plaintiff's MSJ at 14:15-18 [Dkt. No. 231]) (contracts for purchasing, refining, and guaranteeing of gold were not "investment contracts" under California securities law because, among other things, profits were not dependent exclusively on the promoters' efforts); *People v. Woolson*, 181 Cal. App. 3d 657, 671-672 (1960) (Plaintiff's MSJ at 14:7-11 [Dkt. No. 231]) (investment in venture selling gold to Mexican Government was investment contract under the securities laws because there was evidence that the investor would not participate in the business); *Oil Lease Service, Inc. v. Stephenson*, 162 Cal. Ap. 2d 100, 109-113 (1958) (Plaintiff's MSJ at 14:12-13 [Dkt. No. 231]) (contracts to assign U.S. government oil leases were investment contracts within the meaning of California securities laws); *Moore v. Stelling*, 52 Cal. App. 2d 766, 772-773 (1942) (mineral deeds qualify as securities). The question here is not whether the post-closing *limitadas* qualify as investment contracts; it is whether the economic reality of the transactions as a whole was the sale of securities. It was.

**IV.    There is No "Sophisticated Purchaser" Exception to the Definition of "Security" or to the Broker Registration Requirements Under the Exchange Act or California Law, and in Any Event, It Was Mr. Cabrera Who Seeks and Who Needed the Protections of the Securities Laws, Not ADM.**

At several points in its brief, Iguaçu argues that the CCEAA and Jataí transactions fall outside the protections of the Exchange Act because ADM is a sophisticated purchaser who does not need the protection of the federal securities laws. Plaintiff's MSJ Brief at 1:16-17 [Dkt. No. 231] ("Iguaçu

12

1  contends that the LLC interests purchase by ADM were not securities under either state or federal

2  law, since ADM was a sophisticated investor"); 7:14-19, 23-25 (securities laws designed to protect

3  those who cannot personally manage their investments); 9:20-24 (ADM was hardly a passive investor

4  the securities laws were designed to protect); 10:6-11 (referring to ADM as a sophisticated

5  multinational corporation).  For this proposition, Iguaçu relies on the *Slevin* case, 540 F. Supp. 437.

6       Plaintiff's position that the definition of "security" depends on the sophistication of the parties

7  is simply wrong.  The relevant statutory language makes clear that the definitions of "security" under

8  the Exchange Act and California law do not depend on the sophistication of the purchasers or sellers.

9  15 U.S.C. § 78o(a)(10); Cal. Corp. Code § 25019.[12]  Similarly, the language of the Exchange Act,

10 particularly those sections dealing with the registration of brokers and the voiding of unlawful

11 contracts, contains no exceptions whatsoever for sophisticated purchasers.  *See* 15 U.S.C. §§ 78o,

12 78cc(b).  In recognition of this clear statutory guidance, courts have recognized that "[a]s a general

13 matter, securities laws do not distinguish between sophisticated and unsophisticated investors; both

14 are entitled to the protections of its disclosure and anti-fraud provisions."  *In re Scientific Control*

15 *Corporation Securities Litigation*, 71 F.R.D. 491, 512 (S.D.N.Y. 1976).

16       In any event, relying on the alleged sophistication of ADM is a red herring.  The Exchange

17 Act provisions requiring the registration of brokers are as much for the protection of the seller, as the

18 buyer.  *See Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968).  In

19 *Eastside Church*, the Fifth Circuit considered whether to void the transaction of certain sellers with

20 an unregistered broker, even where the sellers had chosen the broker.  *Id.* at 362.  The Fifth Circuit

21 held that the sellers' transactions could be voided, stating: "[u]nder the voiding provision of § 29(b)

22 [15 U.S.C. § 78cc(b)], it is sufficient to show merely that the prohibited transactions occurred and

23 that and that [the sellers] were in the protected class."  *Id.*  Although the Fifth Circuit considered the

24 result to be a "harsh remedy", the Fifth Circuit justified the result, stating:

25 _____

26 [12]  Certain exemptions from Securities Act registration and securities qualification under the
California Corporate Securities Law depend in part on the sophistication of the purchaser.  *See*
Regulation D, Rule 506 under Section 4a(2) of the Securities Act; Cal. Corp. Code § 25102(f).  But

27 these have nothing to do with the definition of security for the purposes of the Securities Act, the
Exchange Act, or California law, nothing to do with the definition of broker, and nothing to do with

28 why brokers must be licensed under the Exchange Act or California law.

1
2
3

> The requirement that brokers and dealers register is of the utmost importance in effecting the purposes of the [Exchange] Act. It is through the registration requirement that some discipline may be exercised over those who may engage in the securities business and by which necessary standards may be established with respect to training, experience, and records.

4   *Id.*

5   In this case, it was Mr. Cabrera, far more than ADM, who needed the protection of the

6   securities laws, in the form of the oversight which the Exchange Act and California law provides.[13]

7   One of the best examples of why Mr. Cabrera needed the protection that registration affords is

8   Iguaçu's unscrupulous conduct concerning the Bardana investment in CCEAA. As discussed above,

9   Bardana was a significant minority shareholder in CCEAA that was bought out in order to complete

10   the CCEAA transaction. Before entering and signing the QPA, Mr. Cabrera sent Iguaçu an email,

11   together with a statement of his counsel, Wanderley Fernandes, stating that a commission on the sale

12   price amounts that would go to Bardana was not in accordance with the Agreement and would be

13   unreasonable, and asking Iguaçu to clarify its position on the matter. *See* Declaration of Antonio

14   Cabrera Mano Filho [] Support of Defendant's Motion to Vacate RTAO Order and Order for

15   Issuance of Writ of Attachment ("Cabrera Vacate Decl.") Exh. D [Dkt. No. 63]. Mr. Fernandes

16   wrote in the statement included with the e-mail that they would need to restructure the transaction to

17   provide for a direct purchase by ADM if Ms. Seturam was going to claim a commission on that sale.

18   *Id.* Mr. Cabrera requested a prompt response. *Id.*

19   Ms. Seturam first responded by advising Mr. Cabrera, among other things, "Pl DON'T alert

20   ADM to our minor difference of opinion" because "ADM will not agree to accept assigning of any

21   disputed agreements" and that it is not necessary to assign a value now to Iguaçu's commissions with

22   ADM's Domingo and Steven [Steven Mills Executive Vice President and Chief Financial Officer of

23   ADM Illinois] pressing you to a 6 pm deadline tomorrow . . ." In that same e-mail, Ms. Seturam

---

24
25
26
27
28

[13]  Exchange Act Section 15A provides for Self Regulatory Associations to regulate the conduct and activity of brokerage firms both under the Exchange Act and its own rules, subject to SEC oversight. The only such association is the Financial Industry Regulatory Authority ("FINRA"). Section 15(b)(8) of the Exchange Act requires that all brokers be members of FINRA (with one inapplicable exception). 15 U.S.C. § 78o(b)(8). FINRA Rules require, among other things, appointment and testing of supervisors and representatives, designation of compliance officers who must also pass required tests, written supervisory procedures, customer complaint procedures, reasonable charges for services, fair prices and commissions, and compliance with high standards of commercial honor and just and equitable principals of trade.

CABRERA'S MEMO. IN OPPOSITION TO PLAINTIFF IGUAÇU, INC.'S MOTION FOR PARTIAL
SUMMARY JUDGMENT; Case No. C-090380 RS (NMC)

sought to soothe Mr. Cabrera's concerns further, stating "[b]roadly, order-of-magnitude, our commissions are unlikely to exceed about one month of your dividends in a steady state."  Ms. Seturam sent a second email about 3 hours later stating that she understood "where you are coming from," that she doesn't want "this tail to sorta the [sic] wag the dog for now" and to "close the ADM deal," "assign Iguaçu agreement to ADM," "and then work it out amicably, okay?"  Cabrera Vacate Decl. ¶¶ 16-18 and Exhs. E and F [Dkt. Nos. 63 and 63-1].  Mr. Cabrera then proceeded to enter into the agreements with ADM.

There is no question that Iguaçu is now claiming a commission on amounts paid to Bardana. Declaration of Matthew G. Ball in Support of Plaintiffs' Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment ("Ball MSJ Decl.") Exh. E (Corrected Report of Charles Sterck ["Sterck Report"] at 6) (claiming commission on the $25 million to be paid Bardana) [Dkt No. 235]; Declaration of Matthew G. Ball in Support of Defendant's Opposition to Motion for Partial Summary Judgment ("Ball MSJ Oppo. Decl."), Exh. F (Deposition of Charles Sterck at 12:14-13:1). Apparently, Iguaçu's idea of "working it out amicably" is to bring this lawsuit.  In other words, when Mr. Cabrera complained that he should not owe commissions on money paid to Bardana under the Agreement, Iguaçu encouraged him to close the CCEAA transaction, by downplaying the amount of Iguaçu's commissions in total, promising to work it out amicably when the transaction had closed, and that there would be some kind of assignment of the Sellers Finders Agreement to ADM.

Iguaçu's actions, had it been properly registered under the Exchange Act, would have implicated several FINRA rules, and potentially subjected Iguaçu to several FINRA sanction guidelines.  For example, Iguaçu's conduct would have violated FINRA Rule 2010, which provides that "[a] member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade."[14]

Iguaçu violated this rule by making material representations or material omissions of fact. *See* Ball MSJ Oppo. Decl. Exh. B (Excerpt of FINRA Sanction Guidelines Manual at 88, citing in part FINRA Rule 2010 as authority for sanctions for making material misrepresentations).  Iguaçu also violated FINRA Rule 2020, which provides that "[n]o member shall effect any transaction in, or

---

[14]  The text of this FINRA rule and others can be found online at http://finra.complinet.com.

induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance."

Iguaçu misrepresented the possibility of assigning the Sellers' Finders Agreement to ADM, as long as it did not appear to be disputed. Ms. Seturam later admitted in deposition that assignment of the agreement would have been no sure thing because "typically what happens in joint ventures is the investor tries to buy the assets, not the liabilities." Ball MSJ Oppo. Decl. Exh. C (Deposition of Shobha Seturam at 245:26-246:10). Ms Seturam also deceptively downplayed the size of Iguaçu's commissions that Iguaçu would claim by stating the commissions were "unlikely to exceed about one month of your dividends in a steady state." However, under Iguaçu's calculations,[15] the amount of the commission potentially due Iguaçu for money that **Bardana** received alone is substantial -- approximately $637,000 U.S. (calculated as 4% of 25 million Reais at Iguaçu's preferred exchange rate of approximately 1.57 Reais to the dollar). Iguaçu's latest calculation of their total commissions through their expert was a percentage of approximately $880,000,000 BRL in transactions, which would work out to more than $22 million U.S. at Iguaçu's preferred exchange rate. Ball MSJ Decl. Exh. E (Corrected Report of Charles Sterck, last spreadsheet). This couldn't approximate one month of dividends in a steady state – or any other kind of state – in Mr. Cabrera's wildest dreams. Under FINRA Sanction Guidelines, a registered broker could face penalties for these misrepresentations and deception ranging from a $2,500 fine in the case of negligent misconduct, to a bar for the individual and expelling the firm in the case of egregious conduct, which this arguably is. Ball Decl. Exh. B (FINRA Sanction Guidelines, at 88).

Iguaçu's conduct thus provides a perfect illustration as to why it is that the Exchange Act requires securities brokers to be registered, and why it makes sense to void contracts, and deny brokers their commissions, when brokers violate the registration requirements. Without registration, there is simply no oversight or discipline over unscrupulous conduct like Iguaçu's. *See Eastside Church of Christ*, 391 F.2d at 362.

---

[15] Mr. Cabrera does not agree with Iguaçu's calculations of commissions even if Iguaçu is entitled to recover a commission on the sale of Bardana's stock. Among other issues, Mr. Cabrera does not agree that the 4% commission in the "Seller's Finder Agreement with Iguaçu, Inc." should apply to the CCEAA transaction, nor does Mr. Cabrera agree that a 1.57:1 exchange rate for the Real to the Dollar is proper.

1

2                                    <u>**CONCLUSION**</u>

3          Iguaçu's Motion for Partial Summary Judgment depends on a finding that the interests in

4   CCEAA and Mr. Cabrera's interests in Jataí are not securities under federal and state law.  Iguaçu has

5   not made this showing – indeed, the interests clearly are securities under both federal and state law.

6   Accordingly, Defendant Cabrera respectfully requests that Iguaçu's Motion be denied.

7                                    Respectfully submitted

8
    Dated:  November 29, 2012        By:    */s/ Matthew G. Ball*
9                                           Edward P. Sangster
                                            ed.sangster@klgates.com
10                                          Matthew G. Ball
                                            matthew.ball@klgates.com
11                                          Claudia A. Quiroz
                                            claudia.quiroz@klgates.com
12
                                            Attorneys for Defendant
13                                          ANTONIO CABRERA MANO FILHO

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28