1 | CONSTANCE J. YU (State Bar No. 182704)
E-Mail:    *cyu@sideman.com*
2 | ELLEN P. LIU (State Bar No. 280459)
E-Mail:    *eliu@sideman.com*
3 | SIDEMAN & BANCROFT LLP
One Embarcadero Center, Eighth Floor
4 | San Francisco, California 94111-3629
Telephone:    (415) 392-1960
5 | Facsimile:    (415) 392-0827

6 | ROBERT R. CROSS (State Bar No. 56814)
E-Mail:    *rcross@fablaw.com*
7 | FITZGERALD ABBOTT & BEARDSLEY LLP
1221 Broadway, 21st Floor
8 | Oakland, CA 94612
Telephone:  (510) 451-3300
9 | Facsimile:  (510) 451-1527

10 | Attorneys for Plaintiff
IGUAÇU, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IGUAÇU, INC., | Case No. C 09-0380 RS (NMC) |
| Plaintiff, | **PLAINTIFF IGUAÇU, INC.'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| ANTONIO CABRERA MANO FILHO, | Date:  December 20, 2012<br>Time:  1:30 p.m. |
| Defendant. | Dept.:  Courtroom 3, 17th Floor<br>Judge:  Honorable Richard Seeborg |

**I.      INTRODUCTION**

Cabrera's opposition memorandum ("Cabrera Opp.") rehashes his inverted view of the transactions with ADM contained in his motion for summary judgment and likewise misses the point that the "economic reality" is that ADM only desired to purchase and did purchase quotas in LLCs (*limitadas,* under Brazilian law), and, conversely, neither desired to purchase nor did purchase shares in CCEAA/Limeira.  While ADM provided the funds Cabrera needed to buy out the interests of his family members and lender (Bardana) in the entities that were to comprise the joint venture, there is zero evidence that this was done to avoid U.S. securities laws and there is no policy reason why Iguaçu, which had nothing to do with the structure, should be punished because of how the buyer and seller decided to implement their joint venture.

Completely ignoring the previous statements of this Court on the central issue ("the more pertinent question is the degree to which ADM-Brazil, the buyer, obtained an interest that should be characterized as active, rather than passive") in his defense, Cabrera now reverses course and for the first time contends that he – a Brazilian citizen seeking investments in his Brazilian properties – is the intended beneficiary of the U.S. securities laws, and should be free to disavow his contractual obligations to Iguaçu based on a tortured construction of those laws.  The position is absurd and is unsupported by any persuasive authority or logic.  To the contrary, this case is a poster child for invocation of the doctrine of estoppel, or unjust enrichment to preclude invocation of Section 29(b) of the Securities Exchange Act (15 U.S.C. § 78 ccc(b)) by a seller who got everything he wanted from the purported "broker," immediately decided to repudiate his obligations on no grounds whatsoever, and still later sought a legal loophole to justify his repudiation.  Cabrera tries to justify his repudiation by pointing to Iguaçu's alleged violations of FINRA standards – but this latest brainstorm finds no support in the pleadings or the law.

Cabrera tellingly is silent on the core issue, and thereby tacitly accepts what he cannot dispute: that ADM and Cabrera entered into a joint venture in which both parties shared management and control of the LLCs/*limitadas* comprising the venture.  ADM was not a passive investor in the LLCs and did not expect or need the protection of the U.S. or California securities laws, and Cabrera cannot belatedly invoke those laws to evade his contractual obligations.

**PLAINTIFF IGUAÇU, INC.'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

There is no dispute as to the material facts and Iguaçu's motion for partial summary judgment should be granted.

## II. THE CCEAA/LIMEIRA TRANSACTION DID NOT INVOLVE THE SALE OF SECURITIES TO ADM, EITHER IN FORM OR ECONOMIC SUBSTANCE

The parties agree on the essential facts: ADM desired to own quotas in Brazilian LLCs; in order to be able to sell ADM 49% of the quotas in CCEAA/Limeira, Cabrera first had to buy out the interest of a lender (Bardana) and convert the company from a *sociedade anõnima* (S.A.) to an LLC. Cabrera desired to have ADM provide the funds for the Bardana buyout, and ADM agreed to do so, provided that Cabrera (and his wife, who owned a tiny interest) would sell ADM 49% of the quotas in the converted LLC. While it is true that ADM's funds were used to pay Bardana for its interests in CCEAA (see Cabrera Opp., at 4, fn. 3), ADM's contract was with Cabrera, and he directed ADM to distribute a portion of the purchase price to the lender. (See Declaration of Constance J. Yu in support of Plaintiff's Reply ("Yu Reply Decl."), ¶¶ 2, 3, Exhs. K, L.)

Cabrera ignores this Court's statements concerning the character of the transaction, which emphasized that in analyzing whether the interests purchased by ADM were "securities," the Court should look to whether ADM "obtained an interest that should be characterized as active rather than passive." (Order Denying Mot. for Recons., at 3:15-19, Dkt. # 177) (Exhibit B to Iguaçu MSJ Memo.; *see* Report and Recommendation 6-7, Dkt. # 91 (Exhibit A to Iguaçu MSJ Memo.); Order Adopting Report, Dkt. # 101; *see also* Report and Recommendation, at 4:12-13 ("ADM-Brazil had an agreement to purchase quotas—a fact that Mr. Cabrera does not dispute.").) He also ignores the testimony of Mr. Lastra, ADM's senior executive, that ADM intended to enter into a joint venture with Cabrera, conducted a thorough investigation and analysis of the industrial and agricultural sides of the sugar and ethanol business, contracted for equal management rights in the joint venture entities, and that ADM actively participated in management. (Iguaçu MSJ Memo, at 3-4.)[1]

---

[1] Since Cabrera cannot answer the Court's analysis or Mr. Lastra's testimony, he simply asserts (footnote continued)

2   Case No.: C 09-0380 RS (NMC)
IGUAÇU'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Cabrera rests his entire argument on the *M&A West* case, arguing that it establishes a broad rule that any multi-stage transaction must be "collapsed" down to its first and last stages for purposes of securities law analysis, so that, in economic substance, ADM purchased the stock interests of Bardana and Ms. Cabrera in CCEAA, and not quotas in the reorganized LLC. (Cabrera Opp., at 4-6.)  The *M&A West* case, standing for the specific proposition that parties cannot convert an "affiliate" to a "nonaffiliate" as part of an integrated transaction so as to avoid the limitations of Rule 144, is entirely factually distinguishable from this case.  Its more general proposition (that where an integrated multi-stage transaction is so structured to avoid the securities laws, the courts can "look through" the form to the substance), when applied to this case, compels the conclusion that ADM purchased interests in a joint venture and not stock interests.[2]

Here, unlike in *M&A West,* Iguaçu was not even a party to the challenged transaction and there is no allegation or evidence that the transaction structure had anything to do with the securities laws – much less with Iguaçu's contractual relations with Cabrera.  ADM plainly had no interest in Iguaçu and Cabrera's agreement, and it would be absurd to suggest that ADM did or would have even considered structuring its transaction around protection of Iguaçu or avoidance of U.S. securities laws.  As far as the only participants to the transaction (ADM and Cabrera) were concerned, the economic reality of the transaction was that ADM desired to enter into a joint venture with Cabrera (not with Cabrera, his lender, his brother and his wife), and Cabrera likewise

---

that while he believes that the quota interests ultimately purchased by ADM were securities under federal and state law "because this Court must consider the economic reality of the transaction as a whole, it is not necessary to set forth Defendant's reasons for the purpose of this Motion." (Cabrera Opp., at 8, n. 8; see also p. 11, fn. 20.)

[2]  Subsequent cases interpreting *M&A West* have applied its economic realities test to both similar and different sets of facts.  *See S.E.C. v. Platforms Wireless Intern. Corp.*, 617 F. 3d 1072, 1086 (9th Cir. 2010) (fact pattern similar to *M&A West*); *S.E.C. v. Sierra Brokerage Services, Inc.,* 608 F. Supp. 2d 923 (S.D. Ohio 2009).  In *Sierra Brokerage Services*, the court held that the sale of securities preceding and following a reverse merger were not to be viewed in isolation, but rather as a single transaction designed to culminate in public trading.  *Id*. at 950.  The court noted that the participants clearly intended the transactions to result in public trading and that certain "gift" transactions were merely "preliminary links in the daisy-chain of [the defendant]'s overall plan." *Id*.

desired to be the only other member of the joint venture. For that to happen, Cabrera needed to buy out the other ownership interests, and he persuaded ADM to provide funding to make that possible. If we "follow the money," as Cabrera now urges, it is clear that ADM was willing to pay Cabrera the agreed value of 49% of CCEAA and 80% of Jatai (and three new LLCs), and to have him use part of the purchase price to buy out his lender and partners because ADM did not wish to partner with Cabrera's co-owners and or even to directly obtain their interests. In particular, Bardana was not even a party to any of the ADM-Cabrera agreements. (*See* Cabrera December 2, 2008 Letter to ADM attached as Exh. L to Yu Reply Decl.; and *see* CCEAA Quota Purchase Agreement and Closing Memo., Exhs. C and D to previously-filed Yu Decl. (Dkt. # 234) at Dkt. 234-2, pp. 3 and 4 of 18 (Exh. C) and Dkt. #s 234-4 and 234-5 (Exh. D).)

Moreover, as noted in the Declaration of Leonardo Canabrava Turra in Support of Iguaçu's MSJ Motion, ADM and Cabrera submitted the transaction for review by the Brazilian Antitrust Authority ("CADE"), which specifically authorized ADM to acquire 49% of the quotas in CCEAA and 80% of the quotas in Jatai. (Canabrava Turra Decl., at ¶ 3; Dkt. # 232.) Plainly the Brazilian government – and the parties – recognized the transaction as a simple quota purchase and nothing else.

Cabrera attempts to distinguish *Slevin v. Pedersen Associates, Inc.*, 540 F. Supp. 437, 441 (S.D.N.Y. 1982) since there the parties intended to enter into a partnership together, while here former owners of entities were bought out and had no post-closing role. (Cabrera Opp., at 7.) But here, as in *Slevin,* ADM and Cabrera intended to enter into a joint venture transaction (Lastra Depo., p. 30, previously filed at Dkt. # 234-1, p. 8 of 46) and there were no other "investors" needing protection who "cannot personally watch the managers of all his interests." (450 F. Supp. at 441.) Cabrera likewise distinguishes *Keith v. Black Diamond Advisors, Inc.*, 48 F. Supp. 2d 326, 328 (S.D.N.Y. 1999), as irrelevant since it cannot "trump" *M&A West* and since it is supposedly irrelevant whether ADM and Cabrera shared management authority over the LLCs. (Cabrera Opp., at 8.) To the contrary, the intent (and reality) of ADM's participation in management is the touchstone of securities analysis under both federal and state securities laws, and where both parties actively participate in management of a joint venture as is the case here, the

interests are not securities.  (*See Phillips v. Kaplus*, 764 F.2d 807 (11th Cir. 1985), *cert. denied,* 474 U.S. 1059 (1986) (joint venture held not to be a security); *cf., Robinson v. Glynn*, 349 F.3d 166 (4th Cir. 2003) (members' involvement in the business resulted in a finding that LLC interest was not a security).)

   Finally, responding to Iguaçu's contention that the transfers of stock or quotas between Cabrera and the other former owners were entirely extraterritorial transactions, which would not be governed by U.S. securities law (Iguaçu Mot., at 10-11, fn. 4), Cabrera argues that "[t]he relevant purchase and sale is ADM's purchase of securities from Mr. Cabrera and others." (Cabrera Opp., at 7, n. 6.)  Again, this ignores that the economic reality for ADM and Cabrera was only what ADM ultimately purchased, not what Cabrera did with his partners to set up that purchase.  Cabrera has cited no federal (or state) authority holding or suggesting that U.S. securities laws would apply to transactions among Brazilian co-owners of the entities simply because a U.S.-based entity provided funding, and *Morrison v. National Australia Bank Ltd.,* 130 S.Ct. 2869 (2010) strongly indicates that they would not apply.

## III. THE QUOTAS IN JATAI PURCHASED BY ADM WERE NOT SECURITIES UNDER FEDERAL LAW

   Since Jatai was never an S.A., always a *limitada,* and since ADM indisputably purchased a controlling interest (80%) and exercised active management and control, Cabrera is reduced to arguing that the LLC interests he held prior to the closing were "passive" and gave him no management rights; thus, prior to the ADM purchase, "the interests that Mr. Cabrera held in Jatai were securities under federal law." (Cabrera Opp., at 9.)

   Putting aside the inapplicability of U.S. securities laws to the relations between Mr. Cabrera and his brother before ADM became co-owner of Jatai, Cabrera again turns reality upside down to argue that because the interests he sold to ADM might have been characterized as "securities" prior to the closing, he should be able to disavow his obligations to Iguaçu, a non-party to the transaction.  As discussed above, the argument flies in the face of the Court's prior analysis and statements, not to mention the economic reality that ADM desired to purchase and did purchase interests that gave it the right to exercise joint management and that it actively

1  participated in management post-closing.

2  **IV.  THE CCEAA AND JATAI INTERESTS ARE NOT SECURITIES UNDER CALIFORNIA LAW**
3

4  Cabrera argues that California courts would follow his reading of *M&A West* and apply it
5  here to find that ADM purchased securities as a matter of economic reality.  (Cabrera Opp., at 11-
6  12.)  He also distinguishes the cases cited by Iguaçu as involving alleged "investment contracts,"
7  whereas here the economic reality of the "transactions as a whole" was a sale of securities.  (*Id*., at
8  12.)

9  For the reasons discussed above, the economic reality here was a sale of quotas in LLCs in
10 which both members – ADM and Cabrera – "are actively engaged in the management . . . " (Cal.
11 Corp. Code § 25019.)  The California cases cited by Iguaçu illustrate that active engagement in
12 management is the touchstone of whether to characterize an interest as a security – and here the
13 parties' active management means that ADM did not purchase a security.

14 **V.  CABRERA'S BELATED ATTEMPT TO INVOKE THE PROTECTIONS OF THE SECURITIES LAWS IS MISPLACED**
15

16 Cabrera does an about face and now argues that while ADM was powerful, knowledgeable
17 and sophisticated enough to protect itself, he, on the other hand, "far more than ADM, needed the
18 protection of the securities laws" against Iguaçu's purported bad conduct.  (Cabrera Opp., at 13-
19 16.)  He cites *Eastside Church of Christ v. National Plan, Inc.,* 391 F.2d 357 (5th Cir. 1968) as
20 holding that even where sellers of securities had chosen the broker, they were entitled to void the
21 transactions since the broker was not properly registered.  (*Id*., at 362.)  *Eastside Church* is not on
22 point.  The court noted that the case "presents the not unusual question of which of the innocent
23 parties . . . must bear a loss sustained through the defalcation of a third party with respect to
24 church bonds." (*Id*., at 359.)  The unregistered broker who dealt in church bonds was held liable to
25 return bonds it had purchased from a contractor acting on behalf of the church, since the contractor
26 had failed to remit the proceeds to the church.

27 Here, by contrast, Iguaçu did not buy or sell the alleged "securities," and Cabrera will not
28 "bear a loss" unless he is permitted to disavow the Finder's Agreement.  Cabrera does not seek to

1  void the quota purchase agreements, which established the transactions between ADM and
2  Cabrera, but instead seeks to void the Finder's Agreement, which did not involve transfers of
3  interests or any other transactions prohibited by the securities laws.  *See Regional Properties, Inc.*
4  *v. Financial and Real Estate Consulting Co.*, 678 F.2d 552, 559 (5th Cir. 1982) (a person can
5  avoid a contract under section 29(b) if he can show that the contract involved a "prohibited
6  transaction," that he is in contractual privity with the defendant, and that he is "in the class of
7  persons *the Act was designed to protect*.") (emphasis added.)  Further, under section 29(b) of the
8  Securities Exchange Act, "only unlawful *contracts* may be rescinded, not unlawful *transactions*
9  made pursuant to lawful contracts."  (*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.,*
10 *Inc.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992), *quoting Zerman v. Jacobs,* 510 F. Supp. 132, 135
11 (S.D.N.Y.), *aff'd,* 672 F.2d 901 (2d Cir. 1981).)  The Finder's Agreement was not itself unlawful,
12 since at the time it was executed, neither party had any way to know how any future transaction
13 would be structured.  Thus, Cabrera's reliance on *Eastside Church* is entirely misplaced.

14  Cabrera accuses Iguaçu of "unscrupulous conduct concerning the Bardana investment in
15 CCEAA," reciting a pre-closing exchange of emails between Cabrera and Iguaçu's CEO
16 concerning the parties' position as to whether Iguaçu should be entitled to a commission on ADM
17 funds used to buy out Bardana's interest.  Iguaçu's emails recommended that Cabrera not raise the
18 issue with ADM, reassured him that Iguaçu's commissions "are unlikely to exceed about one
19 month of your dividends in a steady state," and suggested he close the ADM deal, "assign Iguaçu
20 [Finder's] Agreement to ADM," "and then work it out amicably." (Cabrera Opp., at 14-15.)
21 Cabrera baldly asserts that these actions would have violated FINRA rules requiring a member to
22 "observe high standards of commercial honor and just and equitable principles of trade," and
23 prohibiting the use of any "manipulative, deceptive or other fraudulent device or contrivance" to
24 induce the purchase or sale of any security (*Id.*, at 15:19-16:2.)

25  Contrary to Cabrera's new argument, the potential commission of $627,000 (U.S.) on the
26 ADM funds that Cabrera used to buy out Bardana is hardly shocking or unconscionable in light of
27 the fact that ADM invested many multiples of that amount (hundreds of millions of U.S. dollars)
28 purchasing interests in and developing the joint venture and its entities.  It is particularly ironic for

Cabrera now to suggest that "Apparently, Iguaçu's idea of 'working it out amicably' is to bring this lawsuit," after Cabrera completely repudiated the Finder's Agreement, leaving Iguaçu no choice but to initiate litigation, then fought against having to appear in the action until Iguaçu finally obtained a conditional Right to Attach Order. As the Ninth Circuit noted in *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 213-14 (9th Cir. 1962) ("The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act."); *see also Western Federal Corp. v. Erickson*, 739 F.2d 1439, 1443, fn. 5 (9th Cir. 1984) ("An innocent party may sue under § 29(b) to rescind a contract, subject to such equitable defenses as waiver and estoppel.")

## VI.   CONCLUSION

For the reasons discussed above, Iguaçu's motion for partial summary judgment must be granted.

DATED: December 6, 2012                Respectfully submitted,

FITZGERALD ABBOTT & BEARDSLEY LLP
Robert R. Cross

SIDEMAN & BANCROFT LLP
Constance J. Yu
Ellen P. Liu


By:   */s/ Constance J. Yu*
     Constance J. Yu
     Attorneys for Plaintiff
     IGUAÇU, INC.

6620-1\1628265v1