1 | EDWARD P. SANGSTER (State Bar No. 121041)
2 | ed.sangster@klgates.com
  | MATTHEW G. BALL (State Bar No. 208881)
3 | matthew.ball@klgates.com
  | CLAUDIA A. QUIROZ (State Bar No. 254419)
4 | claudia.quiroz@klgates.com
  | K&L GATES LLP
5 | 4 Embarcadero Center, Suite 1200
  | San Francisco, CA 94111
6 | Telephone: 415.882.8200
7 | Facsimile: 415.882.8220

8 | Attorneys for ANTONIO CABRERA MANO FILHO

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| IGUAÇU, INC., | Case No. C 09-0380 RS (NMC) |
|---|---|
| Plaintiff, | **DEFENDANT ANTONIO CABRERA MANO FILHO'S TRIAL BRIEF** |
| v. | Action filed: January 27, 2009 |
| ANTONIO CABRERA MANO FILHO, | Trial Date: September 23, 2013 |
|  | Time: 9:00 a.m. |
| Defendant. | Judge: Honorable Richard Seeborg |

Defendant Antonio Cabrera Mano Filho ("Mr. Cabrera") hereby submits his trial brief to address Iguaçu's claims and the legal issues that need to be addressed, and to explain the implications of those legal issues in the context of the facts that will come out at trial.

## DISCUSSION OF KEY LEGAL ISSUES

**I.   THE FINDER'S AGREEMENT DOES NOT PROVIDE FOR COMMISSIONS ON THE VAST MAJORITY OF IGUAÇU'S CLAIMS**

The evidence will show that Iguaçu is attempting to exploit ambiguities in an agreement that it and its attorneys drafted in order to claim commissions on transactions which the parties never imagined would be commissionable. Mr. Cabrera will address Iguaçu's claims in turn.

**A.   Commissions on Payments by ADM to Persons Other Than Antonio Cabrera (Bardana/Banif and, Alexandre Cabrera)**

This dispute began in October 2008 with the question of whether Mr. Cabrera would owe commissions on money paid by ADM to third parties as part of the transaction. The two major third parties were a company named "Banif," a subsidiary of a European bank referred to as Bardana, which owned one-third of the stock of one company and Mr. Cabrera's brother, Alexandre, who owned the majority interest in the other. Iguaçu claimed Mr. Cabrera owed commissions on all money paid by ADM, whereas Mr. Cabrera claimed that the commissions would be calculated based on payments made to *him*.

The evidence will show the following:

- The language in the Finder's Agreement does not provide for commissions on payments to third parties. The Finder's Agreement does not mention commissions on payments made to anyone other than Mr. Cabrera. The Finder's Agreement specifically lists Mr. Cabrera by name and mentions no one else. ("This sets forth our agreement . . . between 'your company Antonio Cabrera Mano Filho ('You') and our company Iguaçu, Inc.") (Agreement para. 1)).

- It would not be customary for Mr. Cabrera to pay a finders' fee for the amount that was paid by ADM to Bardana or Alexandre Cabrera. It is not customary or standard

practice to collect a finders' fee relating to payments to third party transactions in the absence of specific provisions in a finders' agreement.

- Iguaçu was well aware of the existence of both Alexandre Cabrera and Banif, and their respective ownership roles in the two projects which are the subject of this dispute, before they prepared the Finder's Agreement.

**B.     Commissions on Loans Made by ADM**

By far the largest component of Iguaçu's claim is its claim for commissions on loans made by ADM. The evidence will show the following:

- On its face, the Finder's Agreement does not provide for a commission on a loan made by ADM. The only mention of loans is loans made by Mr. Cabrera to a Buyer.

- The elements of the ADM transactions characterized as short-term, bridge, or working capital loans from ADM – like the loan on which Iguaçu seeks a commission – customarily are not subject to a finder's fee.

- It is not customary to pay a finder's fee, especially a finder's fee as high as 3% to 4%, on financing, which is intended to be in place only for a short time or to vary in amount with short term needs.

**C.     Commissions on Revenues from Ethanol Sales**

Iguaçu claims that it is entitled to commissions on all revenues of the ADM/Cabrera business generated through the sales of ethanol. The evidence will show the following:

- The Finder's Agreement does not refer to "revenues," and nothing in the Finder's Agreement supports Iguaçu's claim for commissions on revenues. Rather, the Finder's Agreement contemplates commissions on sales of "sale of the Property or of a Marketing Arrangement," without ever defining the capitalized terms.

- Iguaçu claims that the phrase "Marketing Arrangement" means revenue from ethanol sales, but Mr. Cabrera never acknowledged understanding the confusing phrase in that manner.

C 09-0380 RS (NMC)
DEFENDANT ANTONIO CABRERA MANO FILHO'S TRIAL BRIEF

3

- The commissions contemplated by the Finder's Agreement were commissions that could be put in escrow at the time Mr. Cabrera reached an agreement with a Buyer. The Finder's Agreement's escrow requirement (Agreement ¶ 2) is completely inconsistent with commissions being owed on revenues from sales of ethanol, which revenues would be realized in a multitude of transactions over time.
- Iguaçu's interpretation is nonsensical. If Iguaçu was entitled to a commission on revenues generated by the business, then Iguaçu, as a "finder," would be in a far better position than the shareholders, or any creditor of the businesses. The evidence will show that unlike Iguaçu's concept of a "finder," the creditors and business owners are not entitled to an immediate cut of gross revenues, before payment of costs.
- Iguaçu's interpretation would be totally at odds with industry practice.
- Iguaçu's contemporaneous emails concerning commissionable events are inconsistent with its self-serving testimony concerning "sales revenue."

### D. Commissions on Sugar Cane Sales to the Mill

Iguaçu claims that Mr. Cabrera owes commissions on all sugar cane that he sold to the ethanol mill operated by the ADM/Cabrera business. The evidence will show:

- As with the other commissions in dispute, nothing in the Finder's Agreement provides for the payment of commissions on sales of raw materials to the business.
- Hours before the parties executed the Finder's Agreement, Ms. Seturam told Mr. Cabrera that no commissions would not be owed on sales of raw materials to the ethanol mill.
- Ms. Seturam sent an email to Mr. Cabrera confirming that representation. In it, she stated that "any revenue expenditure, e.g., raw materials contracts with you and/or contract farming *have been scrupulously excluded*."

- The elements of the ADM transactions characterized as sugar cane purchases or product sales (or pre-payment or hedging or similar arrangements) are customarily not subject to a finder's fee.

## II. THE FINDER'S AGREEMENT IS UNENFORCEABLE BECAUSE ITS TERMS ARE NOT SUFFICIENTLY CLEAR AND THERE WILL BE NO EVIDENCE THAT THE PARTIES HAD A MUTUAL UNDERSTANDING

Under California law, a contract will be enforced if it is sufficiently definite for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached. *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal.App. 4th 613, 623 (1991); *see also* Restatement Second of Contracts § 33(1) ("Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain." ). "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Id.* § 33(2). The Finder's Agreement fails to meet this standard.

The Finder's Agreement is so poorly written that the Court cannot ascertain what the parties' obligations were, and, therefore, whether a breach occurred. The Finder's Agreement attempted to articulate the manner in which commissions would be calculated as follows: "[U]pon closing of a Sale/Purchase, the compensation to be paid Finder shall be 4% of the total consideration paid or to be paid in the Sale for the first location: 3.35% for the second location; and thereafter, 2.67% for each subsequent location (E.g. Minas Gerais, Goias, Mato Grosso, Mato Grosso du Sul, Para, Sao Paulo etc.)." Agreement ¶ 3. The Finder's Agreement defines "Sale" in a confusing and unintelligible manner:

> "Sale" shall mean and include any financial benefit to Buyer with or through You involving a Buyer identified or introduced to You by Finder, including, but not limited to, a Marketing Arrangement, purchase/sales/leasing of all or part of the Property by You, merger, or investment in an loan by You to a Buyer or any entity created by or with You and a Buyer, including a partnership or joint venture relating to or involving the Property or a Marketing Arrangement.

///
///

The Finder's Agreement never explains how the "financial benefit to the Buyer" would be ascertained. Plaintiff's president will be forced to admit that she, herself, did not know what the phrase meant when she signed the Finder's Agreement. The Finder's Agreement does not define the terms "Marketing Arrangement," "Purchase," "total consideration," "first location," or "second location." Nowhere does the Finder's Agreement suggest that loans made by ADM would be commissionable. In short, the key term of the Finder's Agreement is so poorly defined that it will be impossible to determine what the parties' obligations were.

### III. LEGAL CLAIMS MUST ORDINARILY BE DECIDED BY THE JURY BEFORE THE COURT CAN ADJUDICATE AN EQUITABLE CLAIM FOR REFORMATION, BUT IGUAÇU'S REFORMATION CLAIM WILL BE MOOT IF THE COURT FINDS THAT THE AGREEMENT IS SUFFICIENTLY CLEAR TO CONSTITUTE AN ENFORCEABLE AGREEMENT

Ordinarily, legal claims must be resolved by the jury before the Court can adjudicate equitable claims having common issues. "When legal and equitable claims are joined in the same action, the trial judge has only limited discretion in determining the sequence of trial and 'that discretion . . . must, wherever possible, be exercised to preserve jury trial.' *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510, 79 S.Ct. 948, 956, 3 L.Ed.2d 988 (1959). '[O]nly under the most imperative circumstances . . . can the right to a jury trial of legal issues be lost through prior determination of equitable claims.' *Id.* at 510–11, 79 S.Ct. at 956–57." *Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.*, 890 F.2d 165, 170 (9th Cir. 1989).

"The Supreme Court has held that 'where equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims.'" *Ibid.*, quoting *Ross v. Bernhard*, 396 U.S. 531, 537–38, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970). Here, Iguaçu has pled its breach of contract claim so that it necessarily involves common issues with its reformation claim. It only seeks reformation if the Court first determines that the Finder's Agreement is unenforceable. FAC ¶35. Thus, the jury ordinarily would

need to adjudicate the breach of contract claim before the Court could adjudicate the reformation claim.

Iguaçu's fourth claim for relief is conditional, however. It seeks reformation of the definition of the term "Sale," "but only to the extent that the Court determines that the definitions may be otherwise unintelligible, ambiguous or render the Finder's Agreement unenforceable." Joint Pretrial Statement [Dkt. 293], 2:23-3:1. As a result, the Court will only reach the equitable reformation claim if it has *first* ruled as a matter of law that a binding agreement was *not* created. The court should make that determination after the presentation of the evidence to the jury.

### A. Whether the Terms of the Contract are Sufficiently Clear to be Enforced is a Question of Law for the Court

Under California law, a contract will be enforced if it is sufficiently definite for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached. *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal.App. 4th 613, 623 (1991). The issue of whether a contract is sufficiently definite is a question of law for the court. *Id.*; *Ladas v. California State Automobile Assn.* (1993) 19 Cal.App.4th 761, 770, n.2. Thus, the Court must determine as a matter of law whether the Finder's Agreement is sufficiently certain to create a contract.

### B. The Fourth Cause of Action for Reformation will be Moot if the Court Finds that the Finder's Agreement is Sufficiently Clear to be Enforceable

Iguaçu has alleged in its fourth claim for relief that the Finder's Agreement was understood by the parties. It conditionally seeks reformation only if the court determines that the definitions may be otherwise unintelligible, ambiguous or render the Finder's Agreement unenforceable. Therefore, if the Court holds that the Finder's Agreement is sufficiently definite to constitute a binding agreement, Iguaçu's fourth claim for relief for reformation will be moot, and the Court will not need to decide it.

///
///
///

C 09-0380 RS (NMC)
DEFENDANT ANTONIO CABRERA MANO FILHO'S TRIAL BRIEF

7

### C. The Court will Need to Decide the Reformation Claim If, and Only If, It Finds That the Finder's Agreement is Too Vague to Create a Binding Contract

If the Court finds that the Finder's Agreement was so vaguely worded that it did not create an enforceable contract, then there would be no issues for the jury to decide in the absence of reformation. No contract would exist, and the case would be over.

If the Court determines that the Finder's Agreement is too vague to be enforceable, then it will need to adjudicate the reformation claim. If it denies reformation, then once again, the case will be over because no enforceable contract was created.

If the Court reforms the Finder's Agreement, then the jury will need to decide whether to award damages based on the reformed agreement.

## IV. THE COURT SHOULD DENY DECLARATORY RELIEF

The Court ordered Iguaçu to make a choice: (i) proceed to trial now by dropping its declaratory relief claim for commissions on the arbitration pending between Mr. Cabrera and ADM, or (ii) accept a continuance to avoid multiple trials. Iguaçu responded to the Court's order by refusing to make the required choice. Instead, Iguaçu argues that the Court was wrong, and that declaratory relief can be awarded now. Accordingly, Iguaçu continues to proceed to trial now on the declaratory relief claim.

Iguaçu seeks a declaration that it is entitled to commissions on amounts awarded to Mr. Cabrera in a pending arbitration between Mr. Cabrera and ADM.[1] The Court should deny Iguaçu's declaratory relief claim for two reasons. First, a declaratory relief judgment would not provide specific, conclusive relief. At best, it would be an advisory ruling. Second, the declaratory relief claim fails on its merits, because the Finder's Agreement does not include litigation awards or sugar cane sales within the definition of "Sale."

Because Iguaçu has failed to do what the Court required, the Court should now deal with Iguaçu's declaratory relief claim as it would any other in which a plaintiff has failed to prove that it

---

[1] Iguaçu also argues that it is entitled to a declaration that it is entitled to a commission on future sugar cane sales, but as discussed below, no such relief was sought in the Joint Pretrial Statement.

C 09-0380 RS (NMC)
DEFENDANT ANTONIO CABRERA MANO FILHO'S TRIAL BRIEF
8

is entitled to recovery. It should enter judgment in favor of Mr. Cabrera. This will inevitably result in a second lawsuit following conclusion of the arbitration award, but Iguaçu seems determined to pursue that course of action.

### A. The Court Should Deny Declaratory Relief Because the Arbitration Award is Not Amenable to Specific, Concrete Relief

A court may, in an "actual controversy," declare the rights and obligations of the parties. 28 U.S.C. § 2201 (2003). The Declaratory Judgment Act's "actual controversy" requirement is analyzed just as in constitutional cases involving questions of "actual controversy." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-40, 57 S.Ct. 461, 81 L.Ed. 617 (1937). The controversy must be definite and concrete, not merely hypothetical or abstract. *Id.* at 240, 57 S.Ct. 461. The dispute must be subject to specific, conclusive relief, not advisory in nature. *Id.* at 241, 57 S.Ct. 461.

In this case, the Court cannot grant specific, conclusive relief as to an arbitration award that has not been entered. The comments of Iguaçu's counsel at the Pretrial Conference vividly illustrated why. No one can know what form any arbitration award will take. Arbitrators are not required to follow the law, and arbitration awards can take many forms. The arbitrators might award a lump some of money, or they might allocate the award between various claims. They might set off conflicting claims against one another.

Iguaçu is effectively asking the Court to render an advisory opinion on a hypothetical set of facts: *if* an award is entered in Mr. Cabrera's favor, and *if* it can be discerned that the award consists of an award for the value of his interests in the business, and *if* any amount awarded for his interest in the business can be segregated from any other award, then Iguaçu argues that it is entitled to commissions. Those are too many contingencies to constitute the specific, conclusive relief required by *Aetna Life Ins. Co.* and its progeny. The outcome of the arbitration proceeding involves too many variables.

Instead of confronting the uncertainties involved in the arbitration award, Iguaçu sets up a straw man argument and then proceeds to knock it down. Iguaçu argues that the Court could declare its entitlement to commissions on future sugar cane sales. There are several problems with this

argument. Most importantly, Iguaçu is not seeking a declaration that Mr. Cabrera is liable for future sugar cane sales. The declaratory relief sought by Iguaçu is set forth in Paragraph 2(a) of the Joint Pretrial Statement. [Dkt. 293 (describing the relief sought)]. Iguaçu makes clear that it is seeking a declaration that "Iguaçu is entitled to compensation under the Finder's Agreement based on the total consideration paid <u>in connection with ADM's buyout of Cabrera's remaining interests in the ADM/Cabrera entities.</u>" Joint Pretrial Statement [Dkt. 293 at 3:20-22 (emphasis added)]. Nothing about commissions on future sugar cane sales is mentioned. Because Iguaçu is not seeking a declaration of entitlement to commissions on future sugar sales, its assertion that declaratory relief would be available on such a claim is irrelevant. Furthermore, Mr. Cabrera has never sought a continuance because of a claim for commissions on future sugar cane sales. The request for continuance was based on the claim for commissions on the arbitration award.

Future sugar cane sales are fundamentally different from an arbitration award. If the jury determined that commissions were owed on past sugar cane sales, then the Court could fashion concrete relief requiring payment of commissions on future sales--assuming, of course, that commissions would be available on future sales. The problem presented by this case is the availability of declaratory relief on the arbitration award, not future sugar cane sales.

**B.     An Arbitration Award Does Not Constitute a "Sale" within the Meaning of the Finder's Agreement, So No Commission Would Be Owed**

If the Court decides to reach the merits of Iguaçu's claim for declaratory relief, the jury would need to decide whether an arbitration award constitutes a "Sale" within the meaning of the Finder's Agreement.[2] The evidence will show that an arbitration award in the pending arbitration would not constitute a "Sale" within the meaning of the Finder's Agreement, however.

---

[2] As discussed, Mr. Cabrera contends that an arbitration award does not constitute a "Sale," and, therefore, would not be commissionable in any event. Moreover, Mr. Cabrera is entitled to a jury trial on the question of whether an arbitration award is a commissionable transaction.

C 09-0380 RS (NMC)
DEFENDANT ANTONIO CABRERA MANO FILHO'S TRIAL BRIEF
10

### C. The Court Should Deny Declaratory Relief as to Future Sugar Cane Sales Because Sales of Raw Materials are Not Commissionable, and the Finder's Agreement Has Expired

The premise of Iguaçu's claim for declaratory relief as to future sugar cane sales is that it is entitled to recover a commission on Mr. Cabrera's sales of sugar cane to the ethanol mill. There is nothing on the face of the Finder's Agreement that would suggest that commissions are owed on sales of sugar cane, however. Furthermore, Mr. Cabrera will introduce evidence that Ms. Seturam explicitly represented, prior to execution of the Finder's Agreement, that no commissions would be owed on sales of sugar cane. Ms. Seturam confirmed prior to execution of the Finder's Agreement that commissions would not be owed on sales of raw materials. Thus, the evidence will show that the parties never intended that commissions would be owed on sugar cane sales.

Even if commissions *could* be awarded on sugar cane sales, declaratory relief would be improper because commissions would not be owed on *future* sugar cane sales. The Finder's Agreement had a five-year term. It was executed on November 23, 2007, and, therefore expired by its terms on November 23, 2012. A contract with a five-year term cannot reasonably be interpreted to mean that commissions are owed on sugar cane sales in perpetuity.

If commissions are owed on sugar cane sales, such commissions would only be owed on sales that have occurred in the past. If commissions were owed on past sales of sugar cane, such commissions would be included in a damage award made by the jury. Duplicative declaratory relief would be improper.

### V. THE COURT SHOULD DENY REFORMATION UNDER THE LAW AND EVIDENCE IN THIS CASE BECAUSE IGUAÇU CANNOT PROVE THAT CLEAR AND CONVINCING EVIDENCE THAT IT IS ENTITLED TO REFORMATION OF THE DEFINITION OF "SALE" IN THE AGREEMENT

Iguaçu conditionally seeks reformation of the definition of "Sale," which is contained within paragraph 2 of the Finder's Agreement. Iguaçu alleges in paragraph 34 of its First Amended Complaint that it believes that the definition of "Sale"

> was reasonably understood by both Iguaçu and defendant [Antonio Cabrera] to compass all benefits conferred by ADM on defendant and/or any joint venture between defendant and ADM, and neither party intended or expected that Iguaçu's right to compensation would depend upon whether there was a

C 09-0380 RS (NMC)
DEFENDANT ANTONIO CABRERA MANO FILHO'S TRIAL BRIEF
11

> benefit to ADM or require any determination of such benefit. Iguaçu further believes that the definition of "Sale" is sufficiently clear and consistent with the parties' understanding and reasonable expectation, such that the Finder's Agreement is enforceable.

Mr. Cabrera has denied all of Iguaçu's allegations in connection with Iguaçu's claim to reform the definition of "Sale." "In the absence of clear and convincing evidence to the contrary, a written instrument is presumed to express the true intent of the parties. This is particularly true where, as here, the instrument was drafted by an attorney representing the party seeking to alter the terms of the written instrument." *Moore v. Vandermast, Inc.,* 19 Cal.2d 94, 98 (1941) (citations omitted.) Iguaçu does not dispute that the language it now seeks to reform was drafted by its attorneys.

Reformation of a contract is only proper when, through fraud or mutual mistake of the parties, a written contract does not truly express the intention of the parties. Cal. Civil Code Sec. 3399. "Mutual mistake" means "a situation where both parties share the same misconception." *Renshaw v. Happy Valley Water Co.*, 114 Cal. App. 2d 521, 524 (1952) (internal citations omitted). The party seeking reformation of a written instrument "must establish by clear and convincing evidence that the objectionable language found in the instrument was the result of mutual mistake by the parties." *Perry v. Bedford*, 238 Cal. App.2d 6, 11 (1965) (emphasis added). Iguaçu argues that reformation is also available to correct a typographical or scrivener's error, citing California Civil Code section 3399. It is true that the error of a scrivener can be grounds for reformation of a contract, but "the error of the scrivener must be one which mistakes the intent of the principals on both sides of the transaction." *Oates v. Nelson,* 269 Cal.App.2d 18, 25 (1969).

At the outset, Iguaçu will fail to introduce evidence sufficient to persuade the Court that a mistake even occurred. The allegation in Iguaçu's complaint is conditional and equivocal. It alleges that the Finder's Agreement is clear, but at the same time, it alleges that if the Court finds that the Finder's Agreement is unintelligible, then a mistake occurred. Iguaçu cannot have it both ways at this point in the proceeding. Iguaçu either alleges that a mistake occurred, or it does not. So far, it has not been willing to allege unequivocally that a mistake even occurred.

In addition, Iguaçu cannot present competent evidence of a typographical or scrivener's error. Iguaçu's attorneys prepared the Finder's Agreement and they will not testify. Thus, there will be no admissible evidence that a typographical or scrivener's error occurred. Furthermore, without testimony from the attorneys who drafted the Finder's Agreement, there can be no evidence that the attorney mistook the intent of both parties. Finally, the Court conditioned its denial of Mr. Cabrera's attempt to depose the attorneys who allegedly drafted the Finder's Agreement on Iguaçu's representation that it would not seek to blame its attorneys for committing a mistake. Because Iguaçu is foreclosed from blaming the attorneys who drafted the Finder's Agreement, it cannot prove that the Finder's Agreement contains a typographical or scrivener's error necessary to support a reformation claim.

Furthermore, the evidence will show that Iguaçu's president, Shobha Seturam, authored emails *after* the dispute concerning commissions on loans had arisen. In those emails, she *reaffirmed* that the language used in the Finder's Agreement was precisely what she had intended. *See, e.g.*, Exhibit 794 ("We do believe that the Banif buyout is commissionable to us to with 'benefit to buyer'; and you really don't expect us to give up our rights, do you? Honestly, we never track 'seller's benefit' for exactly this reason . . ."); Exhibit 661 ("As per Para 2 in our agreement; any 'benefit to buyer' is commissionable.")

Even if the Finder's Agreement did not accurately reflect *Iguaçu's* intention, Iguaçu will be unable to present clear and convincing evidence that Mr. Cabrera shared Iguaçu's understanding of the intended terms of the Finder's Agreement. The party seeking reformation of a written instrument "must establish by clear and convincing evidence that the objectionable language found in the instrument was the result of mutual mistake by the parties." *Perry v. Bedford*, 238 Cal. App.2d 6, 11 (1965). "'Clear and convincing' evidence requires a finding of high probability." *In re Angelia P.*, 28 Cal.3d 908, 919 (1981). The California Supreme Court has made clear that reformation from mutual mistake is only available when both parties shared the same understanding. "[I]nasmuch as the relief sought in reforming a written instrument is to make it conform to the real agreement or intention of the parties, a definite intention or agreement on which

the minds of the parties had met must have pre-existed the instrument in question. Our statute adopts the principle of law in terms of a single intention which is entertained by both of the parties. Courts of equity have no power to make new contracts for the parties, . . . [N]or can they reform an instrument according to the terms in which one of the parties understood it, unless it appears that the other party also had the same understanding." *Bailard v. Marden*, 36 Cal.2d 703, 708 (1951) (internal citations and quotes omitted).

The evidence as to whether a mutual mistake occurred will be conflicting, at best. Ms. Seturam and Mr. Fisher apparently will testify that they explained in a telephone call prior to execution of the Finder's Agreement that commissions would be owed on loans made by ADM. Mr. Cabrera denies that any such conversation occurred.

There are several reasons why the Iguaçu will fail to prove by clear and convincing evidence that there is any mistake in the definition of "Sale" in paragraph 2 of the Finder's Agreement and that it is theferore entitled to reformation of the contract as to the definition of sale:

First, Iguaçu will present Ms. Seturam's testimony that she did not take notes of her conversations. Instead, she testified that it was her "standard practice" to draft an email regarding the conversation while on the phone, and send the email memorializing the conversation within half an hour of completion of the call. Seturam Depo. Tr., 116:14-117:19. No emails predating execution of the Finder's Agreement mention the subject of commissions on loans. The absence of such emails is important because loan commissions represent by far the largest potential commission that would be owed to Iguaçu. Given Ms. Seturam's testimony that she promptly followed up telephone conversations with confirming emails, the absence of such emails discussing commissions on loans supports will be strong evidence that the topic was not discussed during negotiation of the Finder's Agreement.

Second, it will be undisputed that at the time the conversations regarding the Finder's Agreement were occurring, Mr. Cabrera had already secured a loan from another lender, BNDES. The concept of ADM making a loan did not arise until months after the Finder's Agreement was

C 09-0380 RS (NMC)
DEFENDANT ANTONIO CABRERA MANO FILHO'S TRIAL BRIEF
14

executed, and there would have been no reason for the parties to be discussing potential commissions on loans.

Third, there are no emails or other communications from Mr. Cabrera in which he ever confirmed that he understood he would owe commissions on loans, or that "benefit to the buyer" was really intended to mean "benefit to the Seller." Instead, Mr. Cabrera consistently voiced his disagreement with Iguaçu's characterization of how commissions should be paid several times before the deal closed with ADM.

For these reasons, Iguaçu will be unable to prove by clear and convincing evidence that a mistake justifying reformation of the Finder's Agreement occurred. The Finder's Agreement was written by Iguaçu's attorneys, and there is a strong presumption that the Finder's Agreement accurately reflected the intention of the parties. Further, Iguaçu will fail to prove by clear and convincing evidence that there is any mistake in the definition of "Sale" in paragraph 2 of the Finder's Agreement. Even if a mistake occurred, there is no evidence--much less clear and convincing--that the mistake was mutual.

## VI. CORRESPONDENCE FROM SHOBHA SETURAM ASSERTING IGUAÇU'S ENTITLEMENT TO COMMISSIONS FOR VARIOUS TRANSACTIONS CONSTITUTES INADMISSIBLE HEARSAY AND SHOULD BE EXCLUDED

A large volume of Iguaçu's proposed trial exhibits consists of email correspondence from Shobha Seturam, sent after the parties executed the Finder's Agreement on November 23, 2007, in which she asserts her entitlement to commission payments, including commissions on loans. These self-serving emails are only relevant if they are being offered to prove that she is entitled commissions as asserted in her emails. These emails therefore constitute inadmissible hearsay and should be excluded. Fed. R. Ev. 802, 803. Some illustrative examples of Iguaçu's exhibits containing these inadmissible statements include the following:

| Exhibit No. | Statement Constituting Inadmissible Hearsay |
|---|---|
| 119 | February 20, 2008 email from Shobha Seturam to Antonio Cabrera asserting that Iguaçu's commissions will be based on "ALL capital investment from ADM into the joint venture/holding company with GrupoCabrera," including 1. Equity 2. Loans 3. Land Leases." |

| 175 | AC200689 - October 31, 2008 email from Shobha Seturam to Antonio Cabrera and Wanderley Fernandes asserting that "any and all investments from ADM (incl. loans procured) is commissionable to us . . . ." |
| --- | --- |
| 180 | November 9, 2008 email from Shobha Seturam to Antonio Cabrera and Wanderley Fernandes laying out five categories of transactions as commissionable to Iguaçu. |
| 182 | November 11, 2008 email from Shobha Seturam to Antonio Cabrera and Wanderley Fernandes asserting the five commissionable transactions stated in exhibit 180. |
| 185 | November 17, 2008 email from Shobha Seturam to Antonio Cabrera asserting that commissions are due on goodwill, Banif buyout, and loans with regard to ADM's 49% stock in CCEAA. |
| 193 | December 4, 2008 email from from Shobha Seturam to Antonio Cabrera and Wanderley Fernandes laying out Iguaçu's justification for commissions based on the Finder's Agreement. |
| 208 | January 2, 2009 email from Shobha Seturam to Antonio Cabrera forwarding her lawyer's analysis with regard to alleged commissions owed. |

## VII. IGUAÇU'S OBJECTION TO JURY INSTRUCTION 320--CONSTRUCTION AGAINST DRAFTER--IS MISPLACED AND SHOULD BE OVERRULED

Mr. Cabrera has proposed that the Court give Judicial Council of California Civil Jury Instruction ("CACI") 320--Construction Against Drafter--to the jury. Iguaçu has objected to this proposed Jury Instruction by arguing that "the Finder's Agreement expressly provides that the agreement shall not be interpreted against the drafter" and that "both parties were represented by counsel during the negotiation of the Finder's Agreement." [Dkt. No. 297 at 16.] Iguaçu's objection is without merit.

First, paragraph 10 of the Finder's Agreement does not state that the counsel for each party actually reviewed this Agreement. It merely provides that "[e]ach party has had the opportunity to have their own counsel review" the Finder's Agreement. Indeed, the evidence proffered at trial will show that the Finder's Agreement was not reviewed by Mr. Cabrera's counsel. Second, paragraph 10 of the Finder's Agreement states that "ambiguities, if any, shall not be construed against any party." This rule of construction cannot be waived, so the provision is unenforceable.

California Civil Code section 1654 provides that "[i]n case of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." The canon calling for the resolution of ambiguities against the drafter of a disputed contract rests on the fundamental considerations of policy. *See Tahoe National Bank v. Phillips*, 4 Cal. 3d 11, 20 (1971), citing *Steven v. Fidelity & Cas. Co.*, 58 Cal.2d 862, 871 ("[t]he rule of resolving ambiguities against the drafter 'does not serve as a mere tie-breaker; it rests upon fundamental considerations of policy.'") (internal citations omitted).

Although Mr. Cabrera is not aware of any California case holding that section 1654 cannot be waived, California courts *have* held that fundamental public policies cannot be waived by agreement of the parties. *Brack v. Omni Loan Co.*, 164 Cal.App.4th 1312, 1326 (2008). Furthermore, at least one court has unequivocally stated that enforcing a clause negating the rule of construction that a contract is generally construed against its drafter "in this case, and probably, in any case, would be unconscionable." *See Concept Rehab. v. Short*, No. F-96-019, 1997 Ohio App. LEXIS 758 *7 n.1 (Ohio App. 1997). This is particularly true in this case, where the evidence will show that the Finder's Agreement was drafted by Iguaçu's lawyers and that the ambiguities were caused by them. *See Mayhew v. Benninghoff*, 53 Cal.App.4th 1365, 1370 (1997) (stating that this rule of construction applies with greater force when the person who prepared the writing is a lawyer); *see also* Seturam Depo. Tr. 36:10-17 (in response to the question who participated in developing the boilerplate agreement, Ms. Seturam responded "Attorneys . . . three specifically. Larry Townsend of Owen, Wickersham & Erickson; Gary Mugg of Mugg & Tang; and in Brazil Rodrigo Zulian."); *see also* Tr. 39:19-22 ("Q. All of the language that was in the agreement sent to Mr. Cabrera in November of 2007 came from the attorneys? A. Absolutely. Q. And these are the attorneys for Iguaçu? A. Yes.")

In any event, no case holds that private parties can waive or alter the rule of construction embodied in Civil Code section 1654.

Iguaçu is not simply arguing that the ambiguity should not be construed against itself as the drafter. Having alleged that a mistake was made and that this alleged mistake was created by its

attorneys "flipping the agreements," Iguaçu has the audacity to argue that the ambiguities created by its attorneys should work to its advantage. Iguaçu cannot have it both ways. To deprive the jury from an instruction that the Finder's Agreement should be interpreted against the party who caused the alleged uncertainty in the contract--Iguaçu--would violate a fundamental California policy, and would be improper and prejudicial to Mr. Cabrera. Mr. Cabrera respectfully requests that the Court give Instruction 320 to the Jury.

Respectfully submitted,

K&L GATES LLP

Dated: September 18, 2013      By:   */s/ Claudia A. Quiroz*
Edward P. Sangster
Matthew G. Ball
Claudia A. Quiroz
Attorneys for Defendant
ANTONIO CABRERA MANO FILHO